76 P.2d 453

DOUGLASS v. MUTUAL BEN. HEALTH & ACCIDENT ASS'N.

No. 4282.

Supreme Court of New Mexico.

Dec. 11, 1937.

Rehearing Denied Feb. 28, 1938.

Crampton & Robertson, of Raton, for appellant.

F. S. Merriau, of Raton, for appellee.

BRICE, Justice.

From a judgment for $2,500 in favor of appellee (plaintiff below) this appeal is prosecuted. The parties will be designated "plaintiff" and "defendant" as in the district court.

At the close of plaintiff's testimony in the district court, the defendant moved for judgment, which motion was overruled. The defendant announced that it would stand on its motion; thereupon the district court entered judgment for plaintiff.

The findings of the court support the judgment, and if there is substantial evidence to support the findings of the court it must be affirmed. The motion called for a declaration of law on the question of whether there was substantial evidence to support a judgment for plaintiff. It admits all facts which the evidence, and all reasonable inferences that can be drawn therefrom, will establish. Union Bank v. Mandeville, 25 N.M. 387, 183 P. 394.

The court made findings of fact, from which we deduce the following, that we find to be supported by substantial evidence:

On February 19, 1935, defendant was an insurance company and Grover W. Pryor was one of its soliciting agents, authorized to solicit applications for accident insurance, fill out the answers of applicants in the blank applications furnished by defendant, receive and transmit to his principal money paid as premiums, receive from the company a receipt for the premium and the policy, and deliver them to the insured. This seems to be the usual authority of soliciting agents as appears from reported cases.

On February 19, 1935, Joe C. Douglass was solicited by Pryor to take out an accident policy with defendant. In answer to Douglass' questions, Pryor explained generally the terms of the policy and among other things stated in substance that the policy he was soliciting Douglass to take would become effective as soon as the application and premium were received by defendant's general agent in Albuquerque, which would be in about twenty-four hours from the time the application was signed

and delivered to him and premium of $6.-50 paid to him. Pryor filled out an application on a blank furnished by appellant as Douglass answered the questions printed thereon. After it had been signed, the application was as follows:

"Application for Special Automobile Policy

"1. What is your Name? (Print Name in Full) J. C. Douglass. Sex? Male. Color? White. Age? (Nearest Birthday) 52. Date of Birth? (Month, day, year) 1883, July 28. Height? 6 ft. 2 in. Weight? 175.

"2. What is your address? (Street No.) —————— (city or town) Grenville, New Mex. (State) ——————

"3. Have you ever had an application for Life, Health or Accident insurance rejected or policy cancelled? No.

"4. Have you consulted a physician during the past three years? No. If so, for what? ——————

"5. What are all the duties in connection with your occupation? Truck driver and farmer.

"6. Whom do you name as beneficiary? Name? Mrs. Myrtle Douglass. Address: Grenville, New Mex. Relationship? Wife.

"7. Are you sound physically? Yes.

"8. What is the form number of policy applied for? Form 5. What is the premium? $5.00.

"9. Dated at Des Moines, New Mex. this
(City or Town and State)
19 day of February, 1935.

"J. C. Douglass
(Signature of Applicant)

"Agent's Name Grover Pryor
"Address Des Moines, New Mexi.
"Policy to be mailed to Agent or to Applicant? Applicant.
"Form 5 Auto."

Upon the signing of application, Douglass paid Pryor the initial premium amounting to $6.50. Policy Form 5 was a certain form of policy issued by defendant. It is unnecessary to state its terms, as defendant agrees that the judgment is correct if under the facts Douglass was insured by defendant.

The net premium, together with the application, was mailed by Pryor to the defendant at its general office in Albuquerque, N. M., where they were received by the defendant; who, on February 21, 1935, mailed to "Grover Pryor, Agent, Des Moines, New Mexico," a receipt for the application and premium, to be delivered to Douglass, but which was delivered to the plaintiff after Douglass' death.

On February 23, 1935, Joe C. Douglass was accidentally killed under such circumstances as would, if the policy of insurance he applied for had been in force, have entitled the plaintiff to recover $2,500. The policy was not delivered before or after Douglass' death.

No administration was had on the estate of Joe C. Douglass until in the summer of 1935, when his widow Myrtle Douglass was appointed administratrix of his estate.

On the 2d day of April, 1935, the defendant sent the plaintiff its draft in the

amount of $6.50 payable to the order of "Estate of Joe C. Douglass" for the purpose of returning the amount of the premium paid by Douglass for the insurance. Plaintiff received the draft and delivered it to her attorney, who never returned it to the defendant or offered to do so, though it was never cashed. The defendant company retained this money without offer of return, from the 19th day of February, 1935, until the 2d day of April, 1935, when the draft was sent Pryor, payable to the "Estate of Joe C. Douglass."

A few days after the death of Douglass, the plaintiff, under the direction of defendant's agent Pryor, made out a proof of loss, as though said policy of insurance had been issued, and forwarded the same to defendant. The defendant never denied liability until it mailed to its agent Pryor the draft mentioned, dated April 2d, 1935, payable to Douglass' estate.

The district court found that Pryor stated to Douglass "that if he (Douglass) would sign an application for said insurance, said insurance would be in full force and effect from and after the receipt of said application with the initial premium, by the Albuquerque Agency office of said defendant."

This finding is attacked upon the ground that there is no substantial evidence to support it. The witness Brown testified substantially to these facts. It is true he also testified on cross examination that the impression Pryor left was that the application would have to be approved by the company, but he does not state that Pryor made any such statement. That finding of the court is supported by substantial evidence.

The court found that Pryor was defendant's agent and that he had apparent authority to make the representations relative to the time when the said policy of insurance would go into effect, and that the decedent had no notice of any limitation upon such power and authority at the time he signed the application; and concluded that his acts were in the scope of his apparent authority and were binding on defendant. Defendant contends that there is no substantial evidence that Pryor was more than a soliciting agent; that as a matter of law a soliciting agent has no authority to bind his principal in this kind of transaction.

Pryor did not testify in the case. It is conceded by plaintiff that he was in fact only a soliciting agent, but this was not known to Douglass.

In dealing with an agent, one is required to know the agent's authority; for if the mere word of a person could be accepted as either proof of agency or the extent of it, no business could be safely transacted through agents. But when agency is admitted by words or acts, the real authority of such agent is immaterial; the principal is bound by such apparent authority as his words and acts would indicate to a reasonably prudent man that the agent possessed; or, stating it differently, one dealing with a principal through his agent, if using reasonable judgment and discretion himself, may assume and rely upon the agent being clothed with the authority that

the words and acts of his principal would naturally and reasonably cause him to believe the agent possessed. The apparent authority of an agent must be determined from the nature of the business entrusted to him, the words, acts, and conduct of the principal, and not from the unratified declarations or acts of the agent.

The general principles of the law on this subject are stated by leading authorities as follows:

"* * * Every person is presumed by law to contemplate and intend the natural and proximate results of his own acts, and he cannot avoid them by asserting that he did not really intend or contemplate them. If the principal leads third persons, acting reasonably and in good faith, to believe that his agent possesses a certain authority, then, as to them, the principal will be estopped to deny that the agent does possess it." 2 Mechem on Agency, § 1722.

"* * * The principal cannot, however, expect third persons to have notice of limitations and restrictions, which are in their nature secret and undisclosed. And while, as has been stated, persons dealing with the agent are bound to know the extent of his authority, they may reasonably take the visible and apparent interpretation of that authority by the principal himself as the true one, and as the one by which he chooses to be bound. It is therefore the rule of the law that the rights of third parties, who have reasonably and in good faith relied upon the apparent authority of the agent as previously explained, cannot be prejudiced by secret limitations or restrictions upon it of which they had no notice. * * *" 2 Mechem on Agency, § 1723.

"Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act may be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement of the Law of Agency, § 27.

"b. Inferences from agent's position. Acts are interpreted in the light of ordinary human experience. If the principal puts one into, or knowingly permits him to occupy, a position in which, according to the ordinary experience and habits of mankind, it is usual for the occupant to have authority of a particular kind, anyone having occasion to deal with one in that position is justified in inferring that the person in question possesses such authority, unless the contrary is then made known. What such authority is, is a question to be determined from the facts, like other similar questions." Restatement of the Law of Agency, § 49, Comment b.

"* * * Whenever the principal, by statements or conduct, places the agent in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position, and there-

by justifies those dealing with the agent in believing that he is acting within his mandate, an apparent authority results which replaces that actually conferred as the basis for determining rights and liabilities. The measure of authority consists of those powers which the principal has thus caused or permitted the agent to seem to possess, whether the agent had actual authority being immaterial if his conduct was within the apparent scope of his powers; * * *" 2 C.J.S., Agency, § 96, p. 1210.

■ Douglass was advised by the application, as well as by Pryor, that the application was not a contract of insurance; that the policy applied for would be issued by the Albuquerque office. This was notice that he could not himself bind the defendant to a contract of insurance. Munhall v. Travelers Ins. Co., 300 Pa. 327, 150 A. 645; Browne v. Commercial Union Assurance Co., 30 Cal.App. 547, 158 P. 765; Basinsky v. Mass. Casualty Co., 122 Wash. 1, 209 P. 1077; O'Brien v. New Zealand Ins. Co., 108 Cal. 227, 41 P. 298; Carpenter v. St. Joseph Life Ins. Co., 212 Mo. App. 336, 246 S.W. 623; Maryland Casualty Co. v. Seay (C.C.A.) 56 F.2d 322; Stockton v. Firemen's Insurance Co., 33 La.Ann. 577, 39 Am.Rep. 277.

Without further comment it is quite apparent that Pryor had no authority to issue accident policies, or bind his principal to do so. His authority was that of a soliciting agent not limited by any notice or statement in the application, as is usual with insurance companies. This fact differentiates this case from cases cited by defendant, as will appear further on.

■ The appointment of an agent to solicit insurance clothes him with very considerable authority, unless the authority implied by his appointment is limited, and such limitation called to the attention of one dealing with him.

The authority of such agent is stated by the Supreme Court of the United States in Union Mut. Life Ins. Co. v. Wilkinson, 13 Wall. 222, 234, 20 L.Ed. 617 (a leading authority on the question), as follows:

"This question has been decided differently by courts of the highest respectability in cases precisely analogous to the present. It is not to be denied that the application, logically considered, is the work of the assured, and if left to himself or to such assistance as he might select, the person so selected would be his agent, and he alone would be responsible. On the other hand, it is well known, so well that no court would be justified in shutting its eyes to it, that insurance companies organized under the laws of one State, and having in that State their principal business office, send these agents all over the land, with directions to solicit and procure applications for policies, furnishing them with printed arguments in favor of the value and necessity of life insurance, and of the special advantages of the corporation which the agent represents. They pay these agents large commissions on the premiums thus obtained, and the policies are delivered at their hands to the as-

sured. The agents are stimulated by letters and instructions to activity in procuring contracts, and the party who is in this manner induced to take out a policy, rarely sees or knows anything about the company or its officers by whom it is issued, but looks to and relies upon the agent who has persuaded him to effect insurance as the full and complete representative of the company, in all that is said or done in making the contract. Has he not a right to so regard him? It is quite true that the reports of judicial decisions are filled with the efforts of these companies, by their counsel, to establish the doctrine that they can do all this and yet limit their responsibility for the acts of these agents to the simple receipt of the premium and delivery of the policy, the argument being that, as to all other acts of the agent, he is the agent of the assured. This proposition is not without support in some of the earlier decisions on the subject; and, at a time when insurance companies waited for parties to come to them to seek assurance, or to forward applications on their own motion, the doctrine had a reasonable foundation to rest upon. But to apply such a doctrine, in its full force, to the system of selling policies through agents, which we have described, would be a snare and a delusion, leading, as it has done in numerous instances, to the grossest frauds, of which the insurance corporations receive the benefits, and the parties supposing themselves insured are the victims. The tendency of the modern decisions in this country is steadily in the opposite direction. The powers of the agent are, prima facie, coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals. [authorities] An insurance company, establishing a local agency, must be held responsible to the parties with whom they transact business for the acts and declarations of the agent, within the scope of his employment, as if they proceeded from the principal [authorities].

"In the fifth edition of Americal Leading Cases [917] after a full consideration of the authorities, it is said: 'By the interested or officious zeal of the agents employed by the insurance companies in the wish to outbid each other and procure customers, they not unfrequently mislead the insured, by a false or erroneous statement, of what the application should contain, or, taking the preparation of it into their own hands, procure his signature by an assurance that it is properly drawn, and will meet the requirements of the policy. The better opinion seems to be that, when this course is pursued, the description of the risk should, though nominally proceeding from the insured, be regarded as the act of the insurers.' Rowley v. Ins. Co., 36 N.Y. 550."

"It is the duty of such an agent to prepare the application of a person solicited to insure, so that it will accurately and truthfully state the result of the negotiations, and the agent's failure to do so is in legal effect the fault of the company."

Pfiester v. Missouri State Life Ins. Co., 85 Kan. 97, 116 P. 245.

Pryor did not have a copy of the policy for which he solicited Douglass to apply. He could not interest persons in making applications without describing its terms. It was important for Douglass to know, as nearly as could be determined, the effective date of the policy, and Pryor had apparent and implied authority to supply this important information, upon which Douglass could rely.

The effect was that his application was for a policy that would become effective when it and the premium had been received at the Albuquerque office, which would be in about twenty-four hours. That was the policy Douglass applied for, and that policy should have been described by Pryor in the application. It was in the scope of Pryor's apparent authority to send in an application therefor; and it was the right of the defendant to accept or refuse the application, as it was not binding on defendant until accepted.

There is nothing in the application that would indicate to Douglass that any investigation was necessary before it could be accepted or rejected. It required no medical examination, and it is well known that such policies are issued upon the applications; for death or injury from disease is not insured against. Pacific Mutual Life Ins. Co. of Cal. v. Barton et al. (C.C.A.) 50 F.2d 362.

■■ Defendant knew, or was charged with the knowledge, that Douglass had applied for insurance to take effect when the application and premium were received at Albuquerque with the implication that defendant should have time to read the application, and if it was not approved, the circumstances required the company to return the premium without unreasonable delay, with notice that the application was rejected. It was not authorized to retain the premium *at all* if the application was *not* accepted. If Pryor mailed the application from Des Moines, N. M., on the 19th day of February it would have been received in Albuquerque the next day. On the 21st day of February the company sent its receipt for the premium, and never returned it (or offered to do so) until April 2, 1935, long after Douglass' death.

■ Unless prohibited by statute, it is permissible for an insurance company to agree that the insurance applied for will be in force immediately, or on a date that will be prior to the issuance of the policy. Reck v. Prudential Ins. Co. (N.J.Err. & App.) 116 N.J.L. 444, 184 A. 777.

■ The insurance was in force if the application was approved by the Albuquerque office, notwithstanding a policy had not been issued. In the nature of things the policy could not be issued and delivered before the date the parties agreed that it should become effective, if the offer to insure was accepted by defendant. There is no direct evidence of whether the application was accepted, but the defendant knew and preferred to not give the court the benefit of this knowledge. It is burdened with

all reasonable presumptions that can be deduced from the evidence, and it is a reasonable presumption that it accepted the offer made by Douglass. The application required immediate action. Two days after the premium money was paid a receipt therefor was issued by the Albuquerque office and sent to Pryor for delivery to Douglass. The money was retained thereafter for more than fifty days. A few days after Douglass' death, Pryor, as agent for defendant, assisted plaintiff to make out a claim under the application for the policy sent to the defendant. The record does not show it ever denied liability until it attempted to return to the widow the premium paid by Douglass. Defendant excuses its delay by the assertion in its brief that it retained the money because no administrator had been appointed, to whom it could be delivered. Aside from the fact that the draft was sent in an attempt to return the premium money before an administrator was appointed, there is no such finding of fact, nor any evidence to support a finding to that effect, had it been made; and we will indulge in no presumption favorable to defendant who knew why it retained the premium money and failed to disclose to the court its reasons for so doing. If we should do so, it would be that such evidence if produced would be unfavorable to defendant. 22 C.J. title Evidence, §§ 53, 55 and 56; Kirby v. Tallmadge, 160 U.S. 379, 16 S.Ct. 349, 40 L.Ed. 463, 1 Jones Comm. on Ev. (2d Ed.) § 17.

The general rules of law applicable to such cases are, by high authority, stated as follows:

"The receipt by a purported principal, with knowledge of the facts, of something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such receipt he repudiates the act. If he repudiates the act, his receipt of benefits constitutes an affirmance at the election of the other party to the transaction.

"Comment:

"a. Ordinarily, the receipt by a purported principal who knows the facts, of things to which he would not be entitled unless the transaction were ratified and to which he makes no claim independently of the act of the purported agent, indicates his consent to become a party to the transaction as it was made. Even where he disclaims responsibility for the act of the purported agent, however, he becomes subject to liability to the third person from whom the things were obtained to the same extent as if he had consented to become a party to the transaction, if he receives its proceeds with knowledge of the facts. * * *" Restatement of the Law of Agency, § 98, and comment a.

"The retention by a purported principal, with knowledge of the facts and before he has changed his position, of something which he is not entitled to retain unless an act purported to be done on his account is

affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such retention he repudiates the act. Even if he repudiates the act, his retention constitutes an affirmance at the election of the other party to the transaction.

"Comment:

"a. The retention by the principal under the conditions stated in this Section operates in the same manner as does the receipt of benefits, and the Comment on Sec. 98 is applicable. Ordinarily, when the principal has received benefits which he is entitled to retain only if the transaction by which they were obtained is ratified, and to which he makes no independent claim, his retention indicates his consent to become a party to the transaction; if he disclaims, the person from whom they were obtained may enforce the transaction against him, or may elect to treat the retention as wrongful and maintain an action therefor. The effect of making a mistaken claim to retain the goods is the same as the effect of receiving them under a mistaken claim." Restatement of the Law of Agency, § 99, and comment a.

As applied to insurance contracts, the following authorities sustain us in holding that the application was in fact approved and the insurance was in force at the time of Douglass' death.

A similar case is Reck v. Prudential Ins. Co. (N.J.Err & App.) 116 N.J.L. 444, 184 A. 777, 778. Reck made application for insurance; a receipt was given for the first premium. It provided that the insurance should take effect from the date of the application, provided the application was approved and accepted at the home office. The company retained the premium money until after the death of assured. The court stated:

"It was, therefore, we think, incumbent on the company, if for that or any other reason the insurance be declined by the home office, to manifest this intention by the return of the premium within a reasonable time; otherwise the applicant could assume that his insurance was effective. Contracts may be implied from circumstances as well as by written papers and oral agreement, and insurance contracts are no exception to the rule as numerous cases, textbooks, and digests clearly attest. * * *

"What was a reasonable time within which the premium could be returned, and the applicant thus apprised that the insurance had been declined, would be a question of fact to be determined in the particular case. * * *

"We are not impressed with the contention that there must have been actual formal approval by the company at its home office; this could be inferred from retention of the premium; nor with the contention that there must have been a formal policy actually issued and delivered. * * *

"The receipt of the application and premium by the agent and the issuance of the receipt therefor was the act of the company, and it was the duty of the agent to apprise his employer of what he had done. His

failure in this regard, if failure there was, was not as agent of the insured, but that of the company itself through one of its own selected representatives. Of this the company cannot be heard to complain.

"Nor could the death of the insured within two days of the application and delivery of the receipt, as contended for by the appellant, affect the result. The insurance by the very terms of the receipt became effective on the date of the application and the payment of the premium unless the premium be returned, and the contract must in consequence speak as of that date."

Also see: Long v. Home Indemnity Co. (La.App.) 169 So. 154; Pacific Mutual Life Ins. Co. of Cal. v. Barton, supra; Reed v. Prudential Ins. Co., 229 Mo.App. 90, 73 S.W.2d 1027; Wood v. Kansas City Life Ins. Co., 228 Mo.App. 979, 75 S.W.2d 412; Kearney County Farmers' Mut. Ins. Co. v. Howard, 128 Neb. 179, 258 N.W. 272; Southern Casualty Co. v. Hughes, 33 Ariz. 206, 263 P. 584; Starr v. Mutual Life Ins. Co., 41 Wash. 228, 83 P. 116; Georgia Casualty Co. v. Bond-Foley Lbr. Co., 187 Ky. 511, 219 S.W. 442; Van Arsdale-Osborne Brokerage Co. v. Cooper, 28 Okl. 598, 115 P. 779; Preferred Accident Ins. Co. v. Stone, 61 Kan. 48, 58 P. 986; 32 C. J. title Insurance, §§ 195, 209, 211, 226, and 227.

It is contended by defendant that the agreement sued on is in effect a parol contract of insurance, and is void because prohibited by certain penal statutes of this state. The general rule regarding this contention is:

"(1) Any bargain is illegal if either the formation or the performance thereof is prohibited by constitution or statute.

"(2) Legislative intent to prohibit the formation of a bargain, or an act essential for its performance, may be manifested by

"(a) express prohibition, or

"(b) making the formation of the bargain or the performance thereof a crime, or

"(c) imposing a penalty for the formation of the bargain or for doing an act that is essential for the performance thereof, or

"(d) requiring a license, inspection, or something similar from persons making such bargains or doing acts essential for their performance, or

"(e) other terms of a statute interpreted in the light of the purpose of its enactment.

"Comment:

"a. The legislature can prohibit the formation of any bargain and thereby make it illegal. The question whether the legislature has done so depends on interpretation of the legislative action. In case of express prohibition or of declaring the act a crime there can be no doubt. With reference to the imposition of a penalty or the requirement of a license, the rule cannot be so broadly stated. Legislative intent must be sought in each particular case, and although it is generally true that the imposition of a penalty for entering into a bargain or performing an act that is the subject matter of the bargain makes the bargain illegal, that is not invariably the case. The same is

true of a requirement of a license or inspection or some similar formality. Prohibition may be implied also from other terms of a statute." Restatement of the Law of Contracts, § 580.

There are many exceptions stated in this work, among which is:

Sec. 601. "If refusal to enforce or to rescind an illegal bargain would produce a harmful effect on parties for whose protection the law making the bargain illegal exists, enforcement or rescission, whichever is appropriate, is allowed. * * *

"5. In a State where a standard form of fire insurance policy is prescribed by statute, A, an insurance company, issues to B a policy on his house varying from the standard form. B's house is destroyed by fire. A is under a duty to pay the insurance." Restatement of the Law of Contracts, § 601 and illustration.

The law on this question was stated at an early date by the Supreme Court of the United States in cases that have been often cited and followed by the courts of this country, typical of which is Miller v. Ammon, 145 U.S. 421, 12 S.Ct. 884, 886, 36 L.Ed. 759, and cases cited therein. The court in the Miller Case stated the rule as follows:

"The general rule of law is that a contract made in violation of a statute is void, and that, when a plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover. Pol. Cont., pp. 253 to 260; Penn v. Bornman, 102 Ill. 523; Alexander v. O'Donnell, 12 Kan. 608; Gunter v. Leckey, 30 Ala. 591; Kennedy v. Cochrane, 65 Me. 594; Bank of United States v. Owens, 2 Pet. (27 U.S.) 527, 539, 7 L.Ed. 508, 512; Pangborn v. Westlake, 36 Iowa 546; Harris v. Runnels, 12 How. (53 U.S.) 79, 84, 13 L.Ed. 901, 903. In Bank of United States v. Owens, this court said: 'There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal.' There are some exceptions to this general rule, and the last two cases cited furnish instances thereof. These exceptions are based upon a supposed intent of the legislature. In Pangborn v. Westlake it was thus stated how the exception should be determined: 'We are, therefore, brought to the true test, which is that while, as a general rule, a penalty implies a prohibition, yet the courts will always look to the language of the statute, the subject-matter of it, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment; and if, from all these, it is manifest that it was not intended to imply a prohibition or to render the prohibited act void, the courts will so hold, and construe the statute accordingly.' And in Harris v. Runnels this court, after noticing some fluctuations in the course of decision, and observing 'that we have concluded, before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, that the statute must be examined as a whole, to find out whether

or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so,' added: 'It is true that a statute, containing a prohibition and a penalty, makes the act which it punishes unlawful, and the same may be implied from a penalty without a prohibition; but it does not follow that the unlawfulness of the act was meant by the legislature to avoid a contract made in contravention of it. When the statute is silent, and contains nothing from which the contrary can be properly inferred, a contract in contravention of it is void." Miller v. Ammon, 145 U.S. 421 [12 S.Ct. 884], 36 L.Ed. 759.

The defendant contends that the provisions of sections 71-148, 71-162, 71-165, and 71-168, Comp.St.1929, require policies of insurance to be in writing, and that any policy not conforming to the requirements of these statutes is void. We quote them as follows:

Sec. 71-148. "No insurance company licensed to transact business in the state of New Mexico shall make or permit any variation in favor of any insured in the amount of premiums or rates charged for any contract of insurance from the forms and published rates covering the risk or hazard insured under said contract of insurance, or in the dividends or benefits payable thereunder; nor shall any such company, officer, or agent thereof make any contract of insurance other than as plainly expressed in the policy itself."

Sec. 71-162. "No company licensed to transact an insurance business in the state of New Mexico shall issue or deliver any insurance policy until the form of same, and the rates or rate books and agents' manual and instructions used in connection with the issuance of said policy, have been filed with the superintendent; and if the superintendent shall, within thirty days, notify any company that any policy form thus filed, or the rates and instructions for use in connection with said policy form, are in his opinion contrary to the laws of this state, it shall thereafter be unlawful for such company to issue any policy on the form so disapproved."

Sec. 71-165. "No company licensed to transact an insurance business in the state of New Mexico shall issue or deliver any policy of insurance against loss or damage from sickness or bodily injury or death of the insured by accident, until the form of same, together with schedule of rates applicable thereto, has been filed with the superintendent, and if the superintendent shall, within thirty days, notify any company that any form thus filed in his opinion contains provisions contrary to the laws of this state, it shall thereafter be unlawful for any such company to issue any policy on the form so disapproved; Provided, however, that the action of the superintendent in this regard shall be subject to review by the corporation commission or any court of competent jurisdiction."

Sec. 71-168. "No company licensed to transact an insurance business in the state of New Mexico shall issue any contract of insurance or indemnity assuming liability

on any risk or hazard in the state of New Mexico unless said contract is written, signed and delivered, and the premium collected by and the full commission retained thereon by one of its duly appointed agents licensed in the state of New Mexico."

It was stated in a relatively recent case: "The general rule of law is that an act done in violation of a statutory prohibition is void and confers no right upon the wrongdoer; but this rule is subject to the qualification that when, upon a survey of the statute, its subject-matter and the mischief sought to be prevented, it appears that the legislature intended otherwise, effect must be given to that intention. Miller v. Ammon, 145 U.S. 421, 12 S.Ct. 884, 36 L.Ed. 759; Burck v. Taylor, 152 U.S. 634, 14 S.Ct. 696, 38 L.Ed. 578; Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679." Waskey v. Hammer, 223 U.S. 85, 32 S.Ct. 187, 189, 56 L.Ed. 359.

It was stated by this court:

"The defense interposed here is that the consideration of the contract out of which the notes and trust deed originated, and which they were given to secure, was based upon the violation of a penal statute of the United States. We think the authorities uniformly hold that an act done in violation of a statutory prohibition is void, and confers no right upon the wrongdoer. * * *

"We are aware that the rule above stated is subject to the qualification that when upon a survey of the statute, and from its subject-matter, and the mischief sought to be prevented, it appears that the Legislature intended that the violation of the statutory prohibition should not render a contract void, effect must be given to that intention, but a survey of the statute in question fails to disclose any such intention." Third National Exchange Bank v. Smith, 17 N.M. 166, 125 P. 632, 635.

Insurance contracts are in a class by themselves. These companies are largely responsible for the form of contracts; and their lobbyists are ever present to advise regarding legislation, much of which is prepared by their exceedingly able legal advisors. The books are filled with cases in which contracts and statutes on the subject of insurance are liberally construed in favor of the insured with a view to defeat injustice and oppression. No class of contracts is accepted with such faith in the maker. It is seldom that the contents are known until a premium is paid and the policy delivered; and then but few read or understand the whole of it. No thought is given to the statute regarding policies which protects the insured against discrimination, or as to the required forms of policies, or the fact that forms, schedules of rates and rate books are required to be filed with the superintendent of insurance; that insurance companies are prohibited from issuing policies unless "said contract is written, signed and delivered, and the premium collected by, and the full commission retained thereon by one of its duly appointed agents licensed in the State of New Mexico." According to defendant a violation by the insurer of any one of these statutes, enacted to prevent abuse

and to protect the insured public, will invalidate their policies. Such construction would assume an intent on the part of the Legislature to deprive the insured public of all protection against an insurer whose inclination is to take every legal advantage of those who, by death or accident, are left without support. But little can be added to what was said in Union Ins. Co. v. Wilkinson, supra, quoted in this opinion, and Pfiester v. Mo. State Life Ins. Co., 85 Kan. 97, 116 P. 245, 247, from which we quote the following:

"Few persons solicited to take policies understand the subject of insurance or the rules of law governing the negotiations, and they have no voice in dictating the terms of what is called the contract. They are clear upon two or three points which the agent promises to protect, and for everything else they must sign ready-made applications and accept ready-made policies carefully concocted to conserve the interests of the company. The agent in fact prepares the contract when he writes the application, because the policy, which the applicant does not see until delivered and does not sign, follows an acceptance of the application as a matter of course. In writing the application, the agent does what the company sent him out to do. He negotiates for the company, asks questions for the company, writes down answers for the company, and makes the return for the company. It is not carelessness or imprudence in fact, as people in general understand those terms, for the applicant to take it for granted that the agent will ac-

curately and truthfully set down the result of the negotiations. If he fail to do so, good sense and common justice regard the company as responsible, and not the insurer. The subject, therefore, is sui generis, and the rules of a legal system devised to govern the formation of ordinary contracts between man and man cannot be mechanically applied to it. It is not necessary to review the decisions in which the foregoing conflicting views are maintained. This court favors the one which is least artificial and best conforms to the facts."

It is with these thoughts in mind, all bearing on the question of the wrongs or evil which the statutes seek to remedy or prevent and the purpose sought to be accomplished in their enactment, that we apply the rules of construction we have quoted to the statutes in question, in an endeavor to arrive at the legislative intent.

A violation of section 71-148 (since amended [Laws 1937, c. 138, § 5]), supra, is punishable by a revocation of the certificate of authority to do business in the state. Contracts made in violation thereof are not void by its terms. Its object is to protect the insured, *not the insurer*.

If contracts made in violation of this statute release the insurer, then its object and purpose is circumvented, and the door to injustice and oppression is wide open. The insured ordinarily would not know of any such violation, or that there were in fact published rates or approved forms.

The part of the statute reading, "nor shall any such company, officer, or agent thereof make any contract of insurance other than as plainly expressed in the policy itself," is indefinite as to meaning. But its apparent intent is that when a policy of insurance is issued, the plainly expressed wording of the policy itself is the whole contract of insurance; and is not to be varied by any oral or written change from its specific wording. This has no application to the question being considered. A statute of the State of Washington, in identical words, was construed in National Liberty Ins. Co. v. Milligan (C.C.A.) 10 F.2d 483, and held not to require insurance contracts to be in writing, and we so hold.

Sections 71-148, 71-162, and 71-165 of the Statutes, which we have quoted, prohibit insurance companies from issuing policies until schedules of rates, forms of policies, or other information have been filed with the Superintendent of Insurance; and should be construed together. The implication, if any, that oral contracts of insurance are prohibited by any one of the statutes, applies to all. The courts have construed similar statutes in a number of cases, among which are the following:

The court in Southern Casualty Co. v. Hughes, 33 Ariz. 206, 263 P. 584, 586, in construing similar statutes, stated: "It is claimed by defendant that the action is based upon an oral contract of insurance, and that such agreement is contrary to the provisions of paragraphs 3457 and 3458, R.S. A.1913 (Civil Code). These paragraphs provide that no insurance policy shall be issued until a copy of the form thereof has been filed at least 30 days with the Corporation Commission, and that it shall contain certain provisions and shall not contain certain others. There is no doubt that such provisions, if violated by the insurer, will subject it to a fine. It does not necessarily follow, however, that a policy issued which does not comply with the statute will be void."

In Massachusetts Bonding & Ins. Co. v. Vance, 74 Okl. 261, 180 P. 693, 698, 15 A. L.R. 981, a statute similar to section 71-165 was construed. The court stated: "The contention made here that the language of this statute, 'and if the insurance commissioner shall notify any company of his disapproval of any form of policy, it shall be unlawful for such company to issue any policy in the form so disapproved,' is conclusive that our statute contemplates that an enforceable insurance contract can alone be made in writing. We do not believe that our statute is susceptible to such a narrow construction. That part of the statute has no reference whatever to the making of a contract and was not intended to regulate the manner or method of making one, but was intended to give the insurance commissioner the authority to control the form of policy, which was evidence of a contract previously made. That part of the statute which the company seeks to invoke in its favor was not intended for its benefit at all, but for the benefit of the insured."

The defendant cites Pralle v. Metropolitan Life Ins. Co., 346 Ill. 58, 178 N.E. 371, 374, in which a similar statute of Illinois is construed, together with another statute requiring written applications, signed by the insured, a copy of which was required to be attached to the policy. In construing the two together the Supreme Court of Illinois stated: "It seems clear, therefore, that it is the intent and purpose of that act that oral contracts for accident and casualty insurance of the character here claimed are prohibited." No written application is required under New Mexico statutes.

In Schilbrch v. Inter-Ocean Casualty Co., 180 Wis. 120, 192 N.W. 456, 457, cited by defendant, the court construed the following statute: "On and after the 1st day of January, 1914, no policy of insurance against loss or damage from the sickness, or the bodily injury or death of the insured by accident shall be issued or delivered to any person in this state until a copy of the form thereof and of the classification of risks and the premium rates pertaining thereto have been filed with the commissioner of insurance." And stated: "It is fair to assume that in enacting the sections of the statute now in question the Legislature intended to remove such uncertainties and to prescribe for one uniform mode of effecting insurance against accident. It is true, as claimed by plaintiff's counsel that the statutes do not expressly prohibit this kind of insurance by parol. But much of the language in the statutes referred to seems inconsistent with the idea that parol contracts for this kind of insurance can be legally made.

There was no definite conclusion on the part of the court that because of the statute the oral contract was void, but stated: "In the case before us the application was made a part of the insurance contract, and provided that the insurance would not be in force until the payment in advance of the premium and the delivery of the policy to the plaintiff while he was in good health and free from all injury. Since the accident occurred before the delivery of the policy to plaintiff, in good health, under the terms of the written contract the company was not liable."

This seems to have been the ground upon which the case was ultimately determined. We have no doubt of the correctness of this conclusion. But this case was weakened by the later case of Milwaukee Bedding Co. v. Gracbner, 182 Wis. 171, 196 N.W. 533, 536. The court referred to the Schilbrch Case and the statute with reference to the prohibition against fire insurance companies issuing policies unless the form be filed with the Commissioner of Insurance, and stated: "It must be conceded that on the face of these two statutes the implication against oral contracts of insurance is as strong in the one as in the other, and that, if no regard be had to the subject-matter dealt with by these two sections our reasoning in Schilbrch v. Inter-Ocean Casualty Co., supra, would compel the conclusion that by the language of section 1941-64, the Legislature

also intended to prohibit oral contracts of fire insurance."

On the theory that oral fire insurance contracts were very prevalent and customary, that it operates as a serious disturbance of "settled notions" and business to hold that an insured was without protection until the written policy was issued or delivered, it was held that oral contracts were not prohibited. Further, it was stated that the fire insurance policy was of a standard kind, whereas accident policies contained "all sorts of provisions" and conditions and generally provided that they do not take effect until delivered and then: "Such a provision was in the policy under consideration in Schilbrch v. Inter-Ocean Casualty Co., supra. It is therefore our conclusion that oral contracts of fire insurance have not been prohibited, and our reason for considering the same is the thought that our decision in Schilbrch v. Inter-Ocean Casualty Co., supra, may have cast some doubt upon the question."

We are not impressed with the holding that the difference in the subject-matter of the two statutes justified the conclusion that an oral contract of fire insurance was valid, whereas that of accident was void, under statutes identical in meaning. It was virtually an overruling of the Schilbrch Case in principle.

Defendant cites Munhall v. Travelers Insurance Co., 300 Pa. 327, 150 A. 645, in which a statute of Pennsylvania (40 P.S.Pa. § 440) was construed. It is: "Policies of insurance, made or entered into by any * * * company, may be made either with or without the seal thereof, and they shall be subscribed by the president, or such other officer as may be designated by the directors * * * for that purpose, and * * attested by the secretary * * * and, when so subscribed and attested, shall be obligatory on the company."

Another provision is that no policy shall be issued or delivered unless it contains certain uniform provisions therein specified.

It was held that these statutes required all contracts of insurance to be in writing, subscribed by the president of the company or some designated officer.

The Munhall Case was limited in Rossi v. Firemen's Ins. Co., 310 Pa. 242, 165 A. 16, 19, which was a suit in assumpsit upon a contract of fire insurance. The defendant claimed no contract existed because not in writing. Bloise, an insurance agent whose company had failed, desiring to protect his customers, called defendant's general agent, asking leave to rewrite his customers with defendant company, to which the general agent agreed. He dictated to Bloise a telegram to be signed by Bloise and addressed to the plaintiff, stating that plaintiff had been re-insured with defendant. This telegram was sent by Bloise and received by plaintiff that day. The next morning, before policies could be issued, the plaintiff's property was burned; after which Bloise wrote a policy covering the burned property, signed it as agent of defendant, and delivered it to the plaintiff. This was held to be a binding contract; that the terms were

easily ascertainable, since a contract of insurance entered into without the issuance of a policy is to be regarded as made on the terms and subject to the conditions contained in the standard policy provided by statute. The court said: "The obvious intention, appearing on the face of the telegram, was that it should act as a memorandum evidencing the existence of temporary or preliminary contracts of insurance between the defendant and certain policyholders in the Hampton Roads Company, such contracts to be in force until written policies were issued. Such a preliminary contract, evidenced, as here, by a written memorandum or binder, is valid and effective, even though a loss occurs before a policy is issued."

The court made reference to the Munhall Case and stated: "Whatever may be the effect of this statute on other oral contracts of insurance, we think it displays no intention to invalidate contracts of insurance, whatever their form, which are intended to be in effect only until a formal policy may be executed. No principle of the common law requires that contracts of insurance, any more than other simple contracts, need be in writing, and, therefore, in the absence of charter or statutory regulations forbidding them, oral contracts of insurance are valid."

And after further consideration of the authorities, stated: "At all events, it is apparent that the provisions of this section were not intended to be applicable to a mere temporary and preliminary contract of insurance, such as the one now before us, and

we so hold. So far as Munhall v. Travelers Ins. Co., supra, may have held otherwise, it is no longer law."

The Georgia cases cited by defendant are not applicable, as that state's statute requires that for such contract to be binding it must be in writing. Delaware Ins. Co. v. Pennsylvania Fire Ins. Co., 126 Ga. 380, 55 S.E. 330, 7 Ann.Cas. 1134.

Our view is supported by the Supreme Court of Washington, Kidder v. Hartford Acc. & Indem. Co., 126 Wash. 478, 218 P. 220.

 If it may be said that section 71-168, supra, contemplates that insurance companies shall issue only written contracts of insurance, under penalty of having its license suspended; this does not necessarily imply that such company will be rewarded by a release from liability on contracts made in its violation.

 Ordinarily, by "the *issue* of an insurance contract" is meant its preparation, execution, and delivery as a binding obligation. Coleman v. New England Mut. Life Ins. Co., 236 Mass. 552, 129 N.E. 288. But is it intended that the insured shall be held responsible, and his policy invalidated, if the agent divides commissions with him or some other person whom he may not know. If the insurance contract is void if not in writing, it is likewise void if in writing and delivered, if the full commission is not collected and actually retained, after collection, by an agent of the company (except that it may be divided with a duly licensed agent or broker). This could not be the legislative

intent. One of the objects of the statute is to prevent the splitting of commissions with the insured (See section 71-150, Comp.St. 1929) or some friend of the prospect who may assist the agent in "bringing him through." It was not intended that any contract of insurance made in its violation should be invalid, but that the practice should be discouraged by a forfeiture of the license of the company, agent or broker, violating the statute.

A statute of Washington (Rem.Rev.Stat. § 7152) is: "On and after January 1, 1912, no fire insurance company shall issue any fire insurance policy covering on property or interest therein in this state other than on form known as the New York Standard as now or may be hereafter constituted, except as follows." This language prohibits oral contracts of insurance if Section 71-168, supra, does. There is no difference in the effect of the language. If it is "on form known as the New York Standard," it is written. It was construed by the Circuit Court of Appeals of the Ninth Circuit in Globe Rutgers Fire Ins. Co., 66 F.2d 985, 990 and held that the statute had no application to oral contracts; the court stating:

"As was said by the Supreme Court in the Relief Fire Ins. Case, supra [(Relief Fire Ins. Co. v. Shaw), 94 U.S. 574, 24 L.Ed. 291], such a statute 'applies in terms only to policies, that is, to written contracts of insurance; and has no application whatever to parol insurances.' * * *

"It will be observed that the two sections quoted above contain no negative provisions, denouncing oral contracts of insurance. In 14 R.C.L. 881, § 55, the editors say: 'A statute, or the by-laws of an insurer, containing affirmative words as to the manner of executing insurance contracts, but containing no negative provisions, do not preclude an oral contract of insurance.'

"In the Kidder Case, supra, the Supreme Court of Washington observed: 'As hereinbefore stated, we find in the Insurance Code no prohibition against oral contracts of accident insurance.'

"The Kidder decision also is authority for the statement that the rule for fire insurance and accident insurance should be the same.

"In view of the language of the sections quoted above, and keeping in mind the decisions of the Supreme Court of Washington, we hold that the oral contract of insurance that we are now considering violated no statute of the state of Washington."

See generally annotations in 92 A.L.R. 232, with reference to oral contracts of insurance and in 107 A.L.R. 194, and prior annotations on the same subjects referred to therein.

We do not decide whether this statute has reference solely to written contracts; but do decide that oral contracts are not void because of it.

The form of the policy applied for by Douglass contained the following:

"(d) The term of this policy begins at 12 o'clock noon, Standard Time, on date of delivery to and acceptance by the Insured."

"But the same shall not be binding upon the Association until countersigned by its duly authorized Policy Clerk."

"No agent has authority to change this policy or to waive any of its provisions. No change in this policy shall be valid unless approved by an executive officer of the Association and such approval be endorsed hereon."

This was not brought to the attention of Douglass. The apparent authority of the general agent of an insurance company would authorize him to waive the provisions, notwithstanding the limitation of his actual authority. But that question is not in the case. If the policy had been issued as agreed that would have constituted a delivery to Douglass; and it would have been properly countersigned. But these provisions applied to a written policy, and necessarily could not apply to an oral insurance contract.

The minds of the parties met on the essentials of the insurance contracts. Douglass applied for a particularly described contract. The evidence shows that the nature of the policy was discussed. It may be assumed that the essentials of the insurance contract were specifically stated and agreed upon from the fact that the form was agreed on.

It was stated in Preferred Risk Fire Cons. Co. v. Neet et al., 262 Ky. 257, 90 S.W.2d 39, 42:

"It is said in section 77 of Couch's work that difficulty in establishing the elements necessary where there is an oral contract is frequently obviated, in part at least, by virtue of a rule that it may be regarded as complete and binding upon the presumption that it was made in contemplation of a policy containing the terms and conditions in customary use. 'Moreover, the authorities with few exceptions hold that if an insurance company orally agrees to insure, but wrongfully fails to issue the policy contemplated by the agreement and denies the contract, it waives the right to rely on the conditions which by implication from the oral agreement might have been inserted in a policy.'

"See, also, 1 Cooley's Brief on Insurance, pp. 535, 536, 556."

From the amount of the premium the court could infer that the contract extended for more than the two or three days intervening between the signing of the application and Douglass' death.

Douglass made application for a designated policy, which we have held was accepted by defendant. Under the facts found the essentials of a contract of insurance conforming to such form of contract were in force, though the policy was not delivered.

It was held in Kansas Amusement Co. v. Maryland Cas. Co., 122 Kan. 800, 253 P. 405, that if a written application for insurance is delivered and premium retained, a binding contract of insurance is effected and the insurer has the duty to write a policy in accordance with the application.

"An insurance company which makes a valid oral agreement to issue a policy, but thereafter wrongfully fails or refuses to do so and denies that any contract exists, waives the right to rely on conditions it might have inserted in the policy." Connecticut Fire Ins. Co. et al. v. Fields (Tex. Civ.App.) 236 S.W. 790.

To the same effect are: Kearney County Farmers' Mut. Ins. Co. v. Howard, 128 Neb. 179, 258 N.W. 272; Travelers Ins. Co. v. Taliaferro, 176 Okl. 242, 54 P.2d 1069; Southern Casualty Co. v. Hughes, supra; Perez v. Fort Worth Mut. Benevolent Ass'n (Tex.Civ.App.) 291 S.W. 574; Security Ins. Co. v. Cameron, 85 Okl. 171, 205 P. 151, 27 A.L.R. 444; Metropolitan Casualty Ins. Co. v. Heard et al., 178 Okl. 461, 63 P.2d 720; Clark v. National Aid Life Ins. Ass'n, 177 Okl. 137, 57 P.2d 832; Murphy v. Great American Ins. Co., 221 Mo.App. 727, 285 S. W. 772; Pickett v. Equitable Life Assurance Society (Mo.App.) 27 S.W.2d 452; United Burial & Ins. Co. v. Collier, 24 Ala. App. 546, 139 So. 104.

■ The fact that plaintiff contended in the district court and in this court that the contract of insurance became effective when the application and initial payment was received by the Albuquerque office, while we have held that it became effective as of that date when approved by the Albuquerque office, is immaterial. It does not change the theory of the case in a material way. The material fact is that the application was accepted by the appellant, not that

the soliciting agent, Pryor, was authorized to make a contract of insurance. The district court did not hold that Pryor had authority to make a contract of insurance in behalf of appellant; but that he represented that the policy applied for would be effective the date the policy and remittance was received by the Albuquerque office. Pryor had apparent authority to make such representations, and to accept an application for such a policy, from which the court concluded as a matter of law: "That by failing to give decedent or plaintiff or any other person interested any notice of its rejection or intention to reject said decedent's application until the 2nd day of April, 1935, and by executing and delivering its regular form of receipt for said application and premium, defendant at law accepted said application and by said acceptance and the representations made by its agent, Grover Pryor, with apparent authority thereunto, did complete said contract of insurance, is estopped to deny the existence of said contract and is liable to the plaintiff thereunder in the sum of twenty-five hundred dollars ($2,500.00)." This is exactly the theory upon which we have decided the case, except as to the matter of estoppel. It is our view that in the absence of any evidence on the part of defendant the district court was warranted in his inference that the application had been accepted as a contract.

[22] The plaintiff was entitled to judgment according to the facts found; and even if the district court erred in some of his conclusions of law, that would not justi-

fy a reversal if the findings of fact governed by the correct rules of law are sufficient to sustain the decision. Helvering v. Rankin, 295 U.S. 123, 55 S.Ct. 732, 79 L.Ed 1343.

There has been no material departure from the theory upon which the case was decided in the district court. Neither the district court nor this court followed appellee in his contention that Pryor had authority to bind defendant to a contract of insurance, if he so contended, assuming it was material.

The judgment of the district court is affirmed.

It is so ordered.

HUDSPETH, C. J., and SADLER and ZINN, JJ., concur.

BICKLEY, Justice (dissenting).

I cannot concur in the foregoing opinion. As to whether the legal principles announced are correct, I express no opinion. I have not been able to accept the case decided as the one presented by the plaintiff below in his complaint or as tried and determined by the district court as evidenced by the record of the trial, including the findings and objections thereto and denial thereof, nor as presented in argument here.

The theory of the case as urged by plaintiff from the filing of her complaint down to the last argument here, as it seems to me, is that the contract of insurance was an oral one effectuated by application of the deceased husband of plaintiff for the insurance, accompanied by the payment of a premium and the receipt thereof in the Albuquerque office of the defendant in the State of New Mexico.

Defendant attempted throughout the trial to drive plaintiff into the position of relying upon acceptance or approval of the application by the company's officials in the Albuquerque office or elsewhere as the circumstance which completed the contract according to the testimony adduced on the part of the plaintiff. Plaintiff energetically repelled this effort of defendant. I understand appellee's theory to be that the agent who secured the application accepted and approved the same on behalf of defendant company, subject to the contingency that such application and premium money should arrive in the Albuquerque office of defendant. It is a reasonable inference brought forward by this court in support of the judgment that what was meant by the defendant's soliciting agent accepting the application and premium was that the insurance would be in effect when the application was received at the defendant's Albuquerque office upon acceptance and approval there. There was but one witness who testified as to statements and representations in conversations between the deceased and the soliciting agent of defendant, and defendant's counsel earnestly contended in the lower court and here that according to the testimony of this witness that was all that could be made out of the representations made by the defendant's soliciting agent. Plaintiff just as ear-

nestly and energetically in the trial court and here contends that the representations of the agent were that the insurance would be in effect when the application for insurance and the premium therefor "reached the Albuquerque office of the defendant in the State of New Mexico," and that the testimony of the witness did not support an inference that acceptance and approval by the company's officials in Albuquerque was necessary in order for the insurance to be in effect. If the trial court had accepted defendant's view as to the effect of the witness' testimony, it might be said that plaintiff's theory as presented by her complaint would be deemed to have been amended at the trial. It appears in the course of the argument that counsel for appellee (plaintiff) assisted the trial court in the preparation of findings of fact and conclusions of law. Finding of fact No. 5 is as follows: "That on and prior to the 19th day of February 1935, one Grover Pryor was the duly authorized agent of the defendant company residing at Des Moines, New Mexico, and that on said 19th day of February, 1935, the said decedent applied to said agent for accident insurance, that on said date said Grover Pryor did solicit the application of said decedent for said accident insurance and advise said decedent that the initial premium upon the same would be the sum of six dollars fifty cents ($6.50), explained generally the terms of the policy for which application was being considered, and that the coverage in event of death by accident while riding in or driving an automobile would be the sum of twenty-five hundred dollars ($2,500.00), and that if the decedent would sign an application for said insurance, said insurance would be in full force and effect from and after the receipt of said application with said initial premium in the sum of $6.50 by the Albuquerque Agency Office of said defendant company, and that said application and remittance would reach said Albuquerque office of said defendant company within twenty-four hours after the application had been signed and delivered and the premium paid to said Grover Pryor."

Defendant made objections and exceptions to the findings of fact and conclusions of law, and among the objections to finding of fact No. 5, quoted supra, is the following: "(b) There is no substantial evidence that Grover Pryor stated, explained, or represented to the decedent, Joe C. Douglas, that the insurance applied for would be in force or effect from and after the receipt of the application with the initial premium by the Albuquerque agency office of the defendant. On the contrary, it appears from the only evidence touching this subject, namely, the evidence of the witness Ralph Baum, that the understanding between Grover Pryor and the decedent was that the insurance would not be in effect unless and until the application should be approved by the defendant company."

The objections and exceptions made by the defendant were separately and severally overruled by the court. This leads to the conviction that the court agreed with the plaintiff that the testimony disclosed an un-

derstanding between the company's agent and the decedent that the insurance would be in effect from and after the receipt of the application with the initial premium by the Albuquerque office of the defendant without the necessity of approval by the defendant company further than the approval which had already been given to it by defendant's agent, who solicited, received, and forwarded such application and initial premium.

The majority make out of the failure of the defendant to come forward with proof of facts concerning the handling of the application and the acceptance or rejection thereof after it reached the Albuquerque office a circumstance indicating an acceptance and approval of such application. I am unable to see how a duty rested on defendant to present evidence to disprove acceptance or approval in Albuquerque by the defendant's officials there, or at the home office, when plaintiff had dug herself into the position that acceptance or approval by the agents or officers of the defendant company in the Albuquerque office or the home office was not essential to the establishment of her case.

With great respect for the opinions and decisions of the Justices who concur in the majority opinion, it seems to me that they have departed from the theory of the case as presented in the court below. This has been influenced perhaps by humanitarian impulses, but I believe it to be outside the province of this court and contrary to the proper administration of justice, and, therefore, I dissent.