## MICHAEL CARRIGAN *v.* LYCOMING FIRE INSURANCE CO.

### *Insurance of  Wines, Liquors, &c.*

1. An insurance of liquors intended for illegal sale is invalid; but when the assured was a druggist, and only a *small proportion* of *the property* insured was liquor, and *nothing of illegality* appearing in the contract, or in the design in entering into it, and the contract being *collateral* to the occasional acts of unlawful selling, it is not *invalid;* and the *nature* and *purpose* of the insurance should be submitted to the jury, whether *collateral to,* or in *aid of,* a violation of law.
2. When the *written part* of the policy *included* "*drugs,*" and "*such other merchandise as is usually kept in a country store,*" and the *printed part excepted benzine,* without *written permission,* &c., it should have been submitted to the jury whether benzine came within the *written description of the property insured.*
3. If the defendant's *general agent* stated, when the policy was issued, that benzine was included in it, this would be admissible to show that the company had knowledge of this fact, and if it did have such knowledge, and afterwards levied assessments, received premiums, &c., such acts would change the contract, and the defendant would be estopped from claiming it as originally made.
4. Distinction between the powers of a *general,* and *local,* insurance *agent.*
5. When the policy required the assured to *represent to the company* such fact, if his *interest* was other than an *entire ownership* in the property insured, it is not necessary to mention a lien; nor, a conditional sale, the goods remaining in the possession of vendor.

THIS case was tried at the March Term, 1880, BARRETT, J., presiding. Trial by jury, verdict directed for the defendant.

This was an action of special assumpsit upon an insurance policy, dated April 21, 1875, issued by defendant to D. F. Mullin & Brother, countersigned by M. J. Francisco, general agent of said company, and assigned to the plaintiff with the consent of defendant, October 7th, 1878. Plea, the general issue. The plaintiff introduced in evidence the policy of insurance and his proofs of loss.

The policy, as amended in the written portion thereof, carried $1,200 on "stock in trade, consisting principally of groceries, provisions, drugs and medicines, fancy goods, and such other merchandise as is usually kept in a country store, including wines and liquors,"; and $500 on "store furniture and fixtures, including scales, soda fountain, bottles, labels, stoves, drawers, refrigerator and desks." The policy, among other things, in its printed conditions provided that . . . . . . "if the interest of the assured in the property, whether as owner, mortgagee, lessee or otherwise, be not truly stated in this policy; or if the assured shall keep gunpowder, . . . . . . benzine, benzole, &c., . . . . without written permission in this policy; then, and in every such case, this policy shall be void." Also, that "if the interest of the assured in the property be any other than the entire, unconditional and sole ownership of the property for the use and benefit of the assured . . . it must be so represented to the company and so expressed in the written part of this policy, otherwise the policy shall be void." At the date of the policy D. F. Mullin & Brother were in possession of the stock of goods and fixtures insured; having successively purchased a one half interest each therein from the previous owner. On January 5th, 1874, said James Mullin had sold conditionally to the plaintiff, his one half interest in said property, by a written instrument duly executed and delivered, as security for the sum of $800. Subsequently said D. F. Mullin also became indebted to Carrigan for loans, and in September, 1878, the indebtedness of both amounted to about $1,800. Said Carrigan then brought suit against the firm, and attached the stock in trade and fixtures. The property was sold under the writ on October 5th, 1878, to Carrigan for the sum of $850. Said writ was entered in court; and Carrigan testified as a witness in his own behalf, among other things as follows:

"I took possession of the goods and store in question at the time the policy was assigned to me; I took them for what they owed me; I got title at sheriff's sale; I was the owner of the goods at that time and remained the owner until the fire. The

stock consisted, as stated in the policy, of drugs, medicines, &c.,
. . . . . . Dennis Mullin ran this drug store; he had
charge of it; I was there a good many times, every second day
most; . . . . . Upon cross-examination: " I bought the
property at sheriff's sale, and arranged to have Dennis Mullin be
clerk and do the business for me; James used to help him once
in a while; I was there twice and three times a week; I was
working at home; was there from five until six in the evening;
. . . . . . I always took the money from the drawer when
I was there; the Mullin Brothers worked for me to pay what
they owed me; . . . . Dennis Mullin paid out money to buy
goods with when I was 'nt there; . . . I was not town agent;
nobody appointed me as agent to sell liquors." Dennis F. Mul-
lin testified among other things, as follows:

" That he had been a druggist for ten years; when the policy
was first made out Mr. Francisco (the defendant's general agent)
came and looked the stock all over; I talked with him about
keeping kerosene oil, and he said that was included, and benzine
and turpentine and all oils; I had charge of the store at the time
of the fire"; . . . . . . The agreement was, after the
$1,800 should be paid I could have the store back again with my
brother, but he should be the owner of it until the amount was
paid; that agreement was made quite a while before the sale;
after October 7th, (1878) and before the fire, I had charge of the
premises under this arrangement; James and I were both there;
Carrigan came there occasionally, perhaps two or three times a
week, perhaps oftener; he took the sales from the drawer"; .
. . . . . On re-direct examination: " I knew Carrigan
was going to attach; he told me about it; he told me about get-
ting the store in his hands; he said I might go in and do the busi-
ness as I was doing before, and when we paid up the money we
owed him I might have the store again at the value of $1,800;
the book containing inventory was at Carrigan's at the time of the
fire." On re-cross examination: " We did not look over our
books with Carrigan and ascertain that there was $1,800 due him;
no use of going through books with Carrigan; he don't know

Carrigan v. Insurance Co.

anything about writing; he cannot read or write; we talked it over that it was in the neighborhood of $1,800, before he brought suit."

It appeared from the evidence that the wines and liquors referred to in the policy and mentioned in the inventory and in the bills of purchase annexed to the proofs of loss, were kept on hand for sale as part of the business carried on at the store in question; that at the time of the fire there was remaining unsold of such liquors about a hogshead of ale, half a barrel of whiskey and some of the wines and liquors; that the white ash counter, ale pump, one of the refrigerators, bar-room pictures, tin pipes and clamp, glasses, some of the faucets, and other articles of furniture and fixtures included in said inventory, were used in and about the business of such sale of liquors.

The defendant's counsel moved that the court direct a verdict for the defendant upon the following grounds: First, because the contract declared upon, and the claim presented in the proofs of loss, embraces " wines and liquors " kept for sale contrary to law, and also the furniture and fixtures used in such illegal trade; second, because benzine was kept for sale as part of the stock of goods, whereby the policy became void; third, because at the time the policy was first issued the ownership of D. F. Mullin & Bro. was not " entire, unconditional," &c.; and fourth, because the ownership of the plaintiff was not " entire, unconditional and sole " as the Mullins had an equitable title to the goods, and had a right to redeem them; that the property belonged to the Mullins on paying Carrigan the $1,800. The plaintiff requested the court to submit to the jury, and direct a special verdict, as to the keeping liquors for unlawful sale, and as to the title of the plaintiff. The request was denied, and the plaintiff excepted.

*Redington & Butler*, for the plaintiff.

The entire contract is good. Greater effect is to be given to the *written* than printed words in the policy. *Hoff* v. *Ætna Ins. Co.*, 32 N. Y. 405; *White* v. *Hudson River Ins. Co.*, 15 How. N. Y. Pr. 288; U. S. Dig. vol. 7, p. 638, s. 72. Whether the contract was made for an illegal purpose was a question for the

Carrigan *v.* Insurance Co.

jury. *Bellows* v. *Russell,* 20 N. H. 427. Mere moral turpitude will not avoid a contract; there must be illegality. *Moore* v. *Remington,* 34 Barb. 427. If the original contract was void, the new contract with Carrigan was good. *Armstrong* v. *Toler,* 11 Wheat. 272; *Smith* v. *Barstow,* 2 Dougl. (Mich.) 155; *Quirk* v. *Thomas,* 6 Mich. 76; U. S. Dig. vol. 3, 1st series, p. 476, s. 1478. In this case it was solely the province of the jury to decide whether Carrigan *unlawfully* kept liquors. U. S. Dig. 1st series, vol. 13, p. 736, s. 3535. Distinction between contracts whose *direct* purpose is to encourage acts in violation of law, and contracts only *collateral* to such acts. *Boardman* v. *Merr. Ins. Co.,* 8 Cush. 583; 11 Wheat. 271. As to benzine being kept, see U. S. Dig. vol. p. 439, (1874 ed.); *Reaper City Ins. Co.* v. *Jones,* 62 Ill. 458; Sansum's Dig. p. 1215; *Phœ. Ins. Co.* v. *Taylor,* 5 Minn. 492. The words " as used in a country store " include benzine. *Holly* v. *Dorch. Ins. Co.,* 12 Gray, 545, 80; *DeLancey* v. *Ins. Co.* 52, N. H. As to the plaintiff's title, see 2 Gray, 216; 34 Ill. 46; 12 Vt. 358; 64 Barb. 589; 51 Vt. 4; Sansum's Dig. 102, s. 9, p. 1379, 674, 40.

*Prout & Walker,* for the defendant.

The interest of James Mullin in the goods had been sold conditionally to the plaintiff when the policy was written. This avoids the insurance. If the insurance is void as to the assignor, it is void as to the assignee. Wood on Ins. s. 132, p. 265; *Eastman* v. ————, 45 Me. The contract cannot be altered by parol. *Cobb* v. *Ins. Co. of N. A.,* 4 Cen. L. J. 359; *Shipman* v. *Oswego & Ohio Ins. Co.,* 21 Alb. L. J. 153 (N. Y. Ct. App.); *Pindar* v. *Cont. Ins. Co.,* 38 N. Y. 364; *Macomber* v. *How. Ins. F. C.,* 7 Gray, 257; *Mead* v. *North Ins. Co.,* 7 N. Y. 530. The plaintiff cannot recover because the insurance was designed to protect the Mullins and the plaintiff in carrying on a traffic forbidden by law. *Spaulding* v. *Preston; Richardson* v. *Marine Ins. Co.,* 6 Mass. 111; 3 Kent. Com. 262; *Boardman* v. *Merr. Ins. Co.,* 8 Cush. 583; *Clark* v. *Protection Ins. Co.,* 1 Story, 109; *Parkin* v. *Dick,* 11 East, 503; *Streit* v. *Sanborn,* 47 Vt. 702; *Terrett* v. *Bartlett,* 21 Vt. 189; *Woodman* v. *Hinman,* 11

Vt. 592; *Kelley* v. *Home Ins. Co.*, 97 Mass. 288; *Johnson* v. *Union M. & F. Ins. Co.*, 127 Mass. 555; *Lawrence* v. *National Fire Ins. Co.*, Ib. 557.

The opinion of the court was delivered by

TAFT, J. The court directed a verdict for the defendants. The motion for such a verdict embraced four causes:

I. The defence claimed that the contract, and the claim under it, embraced liquors kept for sale contrary to law, and the fixtures used in such illegal traffic, which was carried on by the plaintiff; and that by reason of such illegality the policy was null and void.

We think that a contract directly insuring liquors intended for illegal sale in violation of the law of this State is invalid. Such contracts are made in order to afford the assured protection in his illegal acts. SHAW, Ch. J., says: " Where the direct purpose of a contract is to effect, advance, or encourage acts in violation of law, it is void. But if the contract sought to be enforced is collateral and independent, though in some measure connected with acts done in violation of law, the contract is not void." *Boardman* v. *The Merrimack M. Fire Ins. Co.*, 8 Cush. 583. This principle has been applied to contracts of insurance against fire, by the courts of Massachusetts, in several recent cases. In *Kelly* v. *Home Ins. Co.*, 97 Mass. 288, the policy was solely upon liquors and the casks containing them; and in *Johnson and another* v. *Union M. & F. Ins. Co.*, and *Lawrence* v. *National Fire Ins. Co.*, 127 Mass. 555, upon billiard and drinking saloons, unlicensed, kept in violation of law. At the time the policies in these cases were issued, it must have been apparent to the insurers that the object of the contracts was illegal, unless the insured were duly licensed; and the cases do not show that any information upon that subject was sought for; and the insured would have had no cause for complaint, in case of loss, if the defendants insisted upon the illegal nature of the business as a defence. The same subject has been under consideration in Michigan; and the Supreme Court of that State, in a case almost iden-

tical with this, held that the policy was valid, stating, that, to make the case analogous to those involving marine policies on unlawful voyages, and lottery insurances which have been uniformly held null, would require the policy to be in express terms insuring the party selling liquors against loss by fire or forfeiture. In speaking of such marine and lottery policies, CAMPBELL, J., says : " These cases are not at all parallel because they rest upon the fact, that in each instance it is made a necessary condition of the policy that the illegal act shall be done. The ship being insured for a certain voyage, that voyage is the only one upon which the insurance would apply, and the underwriter thus becomes directly a party to an illegal act. So insuring a lottery ticket requires a lottery to be drawn in order to attach the insurance to the risk. But this insurance attaches only to property, and the risks insured against, are not the consequences of illegal acts, but of accident. Our statute does not in any way destroy or affect the right of property in spirituous liquors, or prevent title being transmitted, but renders sales unprofitable by preventing the vendor from availing himself of the ordinary advantages of a sale, and also affixes certain penalties. If the owner sees fit to retain his property without selling it, or to transmit it into another state or country, he can do so. By insuring his property the insurance company have no concern with the use he may make of it, and as it is susceptible of lawful uses, no one can be held to contract concerning it—in an illegal manner, unless the contract itself is for a directly illegal purpose. Collateral contracts, in which no illegal design enters, are not affected by an illegal transaction with which they may be remotely connected. It is difficult to perceive how public policy can be violated by an insurance of any kind of property recognized by law to exist." *Niagara Fire Ins. Co.* v. *De Graff*, 12 Mich. 124. If the purpose of the contract in question had been to protect the assured in the sale of intoxicating liquors, it would have been null ; but the greater part of the property insured consisted of goods, insurance upon which was subject to no objection. The contract was legal upon its face, nothing appearing to show that the wines and liquors were intended for illegal sale ; and it is a fact not needing proof that in compounding med-

icines, liquors, especially wines and alcohol, are of daily use, and for that purpose their possession and use by druggists legitimate. The assured was a dealer in drugs and medicines, and in that respect legitimately and presumably using liquors. There was evidence tending to show that he illegally sold them, including those not used in compounding medicines; and the fact may have been, that the latter trade was the larger and his main one. If such illegal traffic was the business of the assured, and his legal traffic and transactions with other property, a mere cover, ostensibly carried on for the purpose of enabling him to secrete and disguise his iniquity, the purpose of the contract would be to protect him in his illegal ventures, and it would therefore be void; but if he carried on business, using alcoholic liquors legitimately in his drug trade, and occasionally sold them in violation of law, we think that if no illegal design entered into the making of the contract in its inception, that it would be so far collateral to the illegal acts that it would be inconsistent, and in accordance with no well-adjudged case to hold it null. In *Boardman* v. *Merrimack M. Fire Ins. Co.*, *supra*, the policy was upon a building insured as a " shoe manufactory "; but it was, during the life of the policy, used in the drawing of a lottery. Now a policy insuring a building for the latter purpose would be null and void; but the court, by SHAW, Ch. J., held that its subsequent use for that purpose, by the consent of the assured, did not affect their contract with the insurance company; and the plaintiff recovered. The distinction is between the cases where the contract is void in its inception, entered into for the purpose of protecting a prohibited traffic, and those cases where the contract is collateral, and into which no illegal design enters, although by the subsequent acts of the assured, it becomes remotely connected with illegal transactions. We think, therefore, that the case should have been submitted to the jury in accordance with the views herein indicated, for the purpose of determining the nature and design of the contract; and whether liquors were unlawfully sold or not.

II. The property insured by one item of the policy was a " stock in trade consisting principally of groceries, provisions,

drugs and medicines, fancy goods, and other such merchandise as is usually kept in a country store, including wines and liquors." This description is in what is called the written portion of the policy. It is provided in the printed portion that if the assured should keep benzine without written permission in the policy, then the policy should be void. Did the keeping of benzine, which is conceded, have that effect? The evidence had a tendency to show that at the time the policy was issued, the general agent of the defendant told the assured that benzine was covered by the policy; and there are two items of property insured, under either of which such might have been the fact, viz., "such other merchandize as is usually kept in a country store," and "drugs and medicines." If benzine is a *drug*, or is *usually kept in a country store*, then there was written permission in the policy, and it was insured by it; and in that event we do not think that any further written permission was necessary to enable the assured to keep it without rendering the policy null. If it was included in the terms used in the policy, then there was written permission to keep the article as fully as though the policy had read, " On benzine, &c." *Niagara Fire Ins. Co.* v. *De Graff, supra,* in which case it was left to the jury to say, as a question of fact, whether the term " groceries " included wines and liquors. Where the written and printed portions of a policy are inconsistent, the written portion prevails, as it expresses the special agreement and declared intention of the parties at the time of the contract, and the printed parts should be construed in a qualified sense, so as to confine them, as is said, to the " declared purpose and intention of the parties as expressed in the written clauses." This principle is too well settled to need the citation of authorities. Webster defines a drug, as including any mineral substance used in chemical operations; and the court cannot say that as matter of law benzine is not included in that term. This question, as well as the one whether benzine is an article usually kept in a country store, were proper questions for the jury, and should have been submitted to them if there was any evidence legitimately in the case upon either question. There was evidence that at the time the policy was granted the defendant's agent made statements that benzine was

included in the policy ; and we think this competent evidence legitimately tending to show that fact ; it was the construction that the company itself put upon the terms used in the policy ; and it would be rank injustice for them now, to escape a just lia- bility upon any such pretext. If a company insures goods, using in the description of them, general terms, and tells the insured that the description includes benzine, they should be estopped, in case of loss, from claiming that benzine is prohibited, not permitted upon the premises ; that he cannot recover its value, and that its being there renders his insurance upon other property void,—an apt illustration of the old adage of " adding insult to injury."

In case benzine was covered by the policy, the question raised by the defendant's counsel as to the power of the agent to waive any of the conditions of the policy does not arise, as the article itself was insured, and it did not require, to render the policy valid, a waiver of the condition, which, being printed, is con- trolled by the written part of the policy. But in case the jury should find that benzine was not included in the property insured, the question arises as to the effect of a waiver by Mr. Francisco, should the jury find one shown. The policy contains a condition that *no agent* is empowered to waive any of its conditions without special authority in writing from the company ; and the defendant in- sists that to permit it, without such authority in writing, is to violate the well-settled doctrine that written agreements cannot be altered in that manner. We are not inclined to depart from the doctrine that no parol stipulation, contemporaneous with the contract, can be shown, to vary, add to, or contradict it. A court of law must act on the agreement as made by the parties ; but it is a doctrine no less well settled that a contract not under seal can be changed by a subsequent parol undertaking, and in many instances the companies will be estopped from setting up claims in accordance with the contract as originally made, by having permitted the as- sured to act in the honest belief that the terms of the contract had been legally altered. The evidence of Francisco's statement, that the assured might keep benzine, as showing that it was a part of the contract, would be clearly inadmissible, but as showing that the defendant had knowledge that it was kept by the assured, it

was certainly competent, and if knowing this, they subsequently treated the policy in force and levied assessments upon it, as the papers in the case show they did, until they had received in premiums quite a proportionate share of the face of the policy, we think it violates no rule of law to hold that the contract was changed by the subsequent acts of the parties. For another reason we think this clause in the contract is not applicable to any state of facts which the testimony has any tendency to establish. The person who has no power to waive any condition of the contract unless specially authorized in writing, is an *agent*. There is as substantial a difference between agents transacting a local business, and who have certain limited powers, and general agents, who have a supervision over the business of the company for large territories, and who are supposed to possess great experience and capacity, and have an inspection of the business transacted by local agents, as there is between the president and secretary. And we think that the clause in question refers to *local* and not *general* agents, and that, in the absence of proof to the contrary, the latter are presumed to possess authority to transact all business relating to insurance, and the business of the company generally. The policy shows that Francisco executed it as general agent ; he was general agent for the State ; and we think it was not necessary, to give validity to his acts in this respect, that he should be authorized in writing. As to the authority of general agents, see May on Insurance, 145. This authority has been very much enlarged within the past few years, and in this respect is about co-extensive with that of the company itself.

III. The policy was dated and originally issued on the 21st day of April, 1875, to Dennis F. Mullin and James Mullin. There is a provision in it that " if the interest of the assured in the property be any other than the entire, unconditional and sole ownership of the property for the use and benefit of the assured  .  .  . it must be so represented to the company and so expressed in the written part  .  .  .  otherwise the policy shall be void." At the time the policy was issued the plaintiff held a lien upon an undivided half of the property, to secure a debt due him from

James Mullin. This fact was not represented to the company ; and the defendant claims that the policy was therefore void. This in our opinion depends upon the construction given to the words entire, unconditional and sole ownership. This latter word means the right to own, legal or just claim, or title, proprietorship. If one holds the legal title to property, he is the owner, and he is no more so, by adding the adjectives, entire, unconditional and sole ; he is as much the owner in one case as in the other. The fact that an encumbrance exists upon the property is not inconsistent with the fact that the assured is the owner or holds the legal title. In the connection in which the word, interest, is used, we think it is synonymous with title, the right to the property, the ownership of it ; and it is settled by numerous cases that it is unnecessary to mention encumbrances and liens in answer to inquiries as to title or ownership. *The Manhattan Ins. Co.* v. *Baker*, 7 Heiskell (Tenn.) 503. And this view is confirmed by the fact that in the application for such contracts the inquiry as to the title is almost invariably followed by another as to the encumbrances upon the property, the plain inference being that information as to the latter inquiry is not expected in answer to the first. The question raised by the brief for the defendant, is not the one made by the motion for the verdict, and not having been made below, will not be considered here. We think, therefore, that the policy was valid at its date ; and this renders it unnecessary to pass upon the question of the effect of an assignment of a void policy.

IV. In October, 1878, the plaintiff became the owner of the insured property, and the policy was transferred to him by consent of the defendant, but the defendant claims that the ownership of the plaintiff was not properly represented to the defendant ; that it was not the entire, unconditional and sole ownership, for his use and benefit, which the policy required. If it was not, then the policy was void. We think that admitting all that the testimony in the case has any tendency to show as to the right of the Mullins to any reconveyance of the property to them, that the facts thus proved would not divest the plaintiff of his legal title and owner-

ship of the goods, and his complete control of them in every respect. Until they had complied with the conditions entitling them to a reconveyance they would have no more interest in the goods than a stranger. The property in the goods was in the plaintiff and properly insured in his name. The case is nearly similar to *Boutelle* v. *Westchester Fire Ins. Co.*, 51 Vt. 4, and should be governed by the same principle.

Judgment reversed, and cause remanded.