501 P.2d 255

Richard L. PRIBBLE, Plaintiff-Appellant,

v.

AETNA LIFE INSURANCE COMPANY
and Jerry L. Gaultney, Defendants-
Appellees.

No. 9368.

Supreme Court of New Mexico.

Sept. 22, 1972.

J. Victor Pongetti, Albuquerque, for plaintiff-appellant.

Toulouse & Moore, Larry D. Beall, Albuquerque, for defendants-appellees.

## OPINION

STEPHENSON, Justice.

This suit was brought in the District Court of Bernalillo County to recover medical and hospital expenses under a group policy of insurance ("the policy") issued by the appellee insurance company ("Aetna"), or alternatively, to recover against Aetna and its general agent, appellee Gaultney, on the basis of an estoppel. The court granted appellee's motion for summary judgment and appellant appeals.

The complaint alleges that Mr. Pribble was injured in an aircraft accident while covered under the policy which provided reimbursement of medical expenses up to a maximum of $10,000. It alleges that Mr. Pribble is entitled to the maximum. In the alternative, if the policy does not cover the medical expenses, it is alleged that appellees represented that the accident was covered and in reliance on such representa-

tions, Mr. Pribble incurred medical expenses exhausting the amount payable under the policy, and that appellees are now estopped from denying the coverage.

Appellees, after pleading a general denial, answered that the complaint failed to state a claim upon which relief may be granted and that the policy could not be changed in any material provision after issuance except by an executive officer of the company as therein provided.

After some discovery and the filing of various affidavits the court granted appellees' motion for summary judgment. We will summarize the facts disclosed by the pleadings, depositions and affidavits in the light most favorable to Mr. Pribble.

Aetna insured employees of the Dale J. Bellamah Corporation ("Bellamah") under the policy. Appellee Gaultney was the general agent of Aetna for the State of New Mexico. Mr. Pribble, an employee of Bellamah, was insured under the policy. He was injured in an aircraft accident in the course of his employment. He incurred substantial hospital and medical expenses which were defrayed in part by another insurance policy and by reimbursement of medical expenses under a workmen's compensation policy.

The Aetna group policy provides:

"Covered Medical Expenses are the reasonable charges which an Employee is required to pay for the following services and supplies received by a covered family member for the necessary treatment of any non-occupational injury or non-occupational disease:"

Hospital and other medical expenses are then defined.

Mr. Pribble's injuries were so serious that he could not handle his own affairs and he gave Messrs. Gonzales and Shaw his power of attorney.

Shortly after the accident, Mr. Gaultney met Bellamah executives concerned with determining the medical, hospital, life and other insurance available to Mr. Pribble and the families of the other accident victims for the purposes, among other things, of determining what insurance coverage was available to plaintiff under the policy. During the course of this conversation, Mr. Gaultney said that the $10,000 hospitalization benefit with Aetna would be available to Mr. Pribble but that workmen's compensation medical benefits and other insurance which required no participation by the employee should be used first, saving for last the Aetna policy which covered only 80% of the expense and required the employee to bear 20%. Mr. Gaultney's conversation was recounted to Mr. Pribble and Mr. Gonzales.

Prior to the accident, and in early 1967, Mr. Gaultney participated on behalf of Aetna in the negotiations wherein Bellamah obtained the subject insurance from Aetna, canceling an existing policy with another company. The policy contains a $100 deductible provision per family member as did its predecessor. In the negotiations, Mr. Gaultney verbally agreed that employees who had used the $100 deductible under the prior policy would not be faced with another $100 deductible under the Aetna policy for 1967. During 1967, three employees of Bellamah were charged a second $100 deductible under the Aetna policy. Mr. Pribble, who administered the group policy for Bellamah, called Aetna's attention to the verbal agreement of Mr. Gaultney, whereupon Aetna honored the verbal commitment.

In January of 1969, the prognosis of the treating physician was that it was doubtful if Mr. Pribble could walk again. At this time, he had incurred medical bills in an amount in excess of $20,000. When faced with the decision whether or not to continue treatment, Mr. Pribble stated, "I considered the cost and the doctor's doubt about a successful outcome, but decided that since I had the insurance proceeds to cover the operations, I might as well take the chance." "Had I known that the Aetna coverage was not available at that time, . . . I would have checked myself out of the hospital and quit the rehabilitation therapy." Mr. Pribble continued treatment

and by July 29, 1969, had incurred medical expenses of over $40,000. On June 24, 1969, one of Aetna's agents wrote Mr. Pribble a letter wherein the occupational injury exclusion was raised. However, this letter was not a formal denial of the claim. The letter acknowledges that Aetna had advised Bernalillo County, Medical Center and Bellamah that the ". . . contract would pick up where Fireman's Fund (your workmen's compensation carrier) leaves off . . ." On July 8, 1969, the Agent wrote a letter to Bernalillo County Medical Center, with a carbon copy to Mr. Pribble wherein Aetna indicates the question was still in doubt. On July 29, 1969, Aetna denied coverage under the group policy.

Bellamah employees did not receive a copy of the insurance contract. They received a certificate which in general terms stated the coverage. The certificate covers twenty-nine printed pages. (The policy covers fifty.) Under a portion of the policy entitled "Group Accident and Health Policy Provisions" the term "non-occupational injury" is defined as:

"* * * an accidental bodily injury which does not arise, and which is not caused or contributed to by, or as a consequence of, any injury which arises, out of or in the course of any employment or occupation for compensation or profit."

Seven pages later, under a caption "Exclusions, Limitations and Provisions Applicable to Title CMEB" it is stated:

"No insurance is afforded under this Title CMEB (1) as to charges in connection with * * * an injury other than a non-occupational injury; * * *"

This verbiage creates little difficulty if read rapidly with the thought firmly in mind that occupational injuries are not covered as all counsel seem to agree. It constitutes, in the aggregate, a triple negative. It is curious that simpler language such as "occupational injuries are excluded" is so rarely used in policies.

Mr. Pribble had no actual knowledge that the policy excluded from coverage occupational injury nor that the master policy contained a provision that no change in the policy was valid unless approved by an executive officer of Aetna.

Mr. Gaultney was sued as an individual. Several distinctions may exist between the legal position which he occupies and that of Aetna, but no basis of liability on his part, distinct from Aetna, is presented. No distinction is drawn between the two appellees, and we will therefore treat Mr. Gaultney as though he stands with Aetna. Similarly no significance is attributed to the fact that the assured was Bellamah which is not a party. We are neither holding nor inferring this is a consideration of significance, but it should be understood that the parties have presented and argued the case as though Mr. Pribble was the assured with no distinction between his position and that of Bellamah. We will do the same.

This being an appeal from a summary judgment, our consideration of the factual material presented is governed by our recent definitive opinion in Goodman v. Brock, 83 N.M. 789, 498 P.2d 676 (1972).

Mr. Pribble first argues that Mr. Gaultney had actual or apparent authority to change or waive the terms of the policy in such a way that the former's injury would be covered. Aetna asserts that, as a matter of law, Mr. Gaultney had neither such actual nor apparent authority.

Considering first the issue of Mr. Gaultney's actual authority, the policy provision relied upon by Aetna provides:

"This policy may be changed at any time or times by written agreement between the Insurance Company and the Policyholder, without the consent of any employee or other person. No change in this policy shall be valid unless approved by an *executive officer* of the Insurance Company and unless such approval be endorsed hereon or attached hereto. No *agent* has authority to change this policy

or to waive any of its provisions." (Emphasis added.)

Neither "executive officer" or "agent" are otherwise defined.

Aetna, being a corporation, can function only through its agents and servants. There is nothing before us to indicate whether the term "executive officer" means only those individuals who occupy titled corporate positions, such as president or treasurer or the like, or whether the term is used in a more general sense meaning those to whom executive functions have been delegated by the corporate charter or by-laws, or by the directors. It could mean those who merely perform executive functions in actual practice. The word "executive" lacks specificity.

Moreover, such persons, whoever they may be, would under ordinary agency law be regarded as "agents" of the corporation, yet the quoted portion of the policy precludes agents from changing it or waiving any of its provisions. Likely, by "agent" is meant "sales agent" but even should we so assume the query as to where a "general agent", such as Mr. Gaultney, fitted into the picture remains unanswered.

A "general agent" has been held not to be an "officer" of an insurance company. Vardeman v. Penn. Mut. Life Ins. Co., 125 Ga. 117, 54 S.E. 66 (1906). On the other hand, it has been held that the word "agent" when used in an insurance policy does not include "general agent" but rather refers only to "local agent." Carrigan v. Lycoming Fire Insurance Co., 53 Vt. 418 (1881).

Here we are concerned with whether one employed by an insurance company under the title of "general agent" is in effect one of the company's "executive officers" or whether he is merely an "agent" of the company. Concerning the application of non-waiver provisions, it is said in 43 Am. Jur.2d Insurance § 1089:

"In applying the rule that a nonwaiver agreement is not conclusive upon the insured and that a waiver of such an agreement, or despite such an agreement, may be effected against the insurer, the question arises as to what agents of the insurer may effect such a waiver. It is generally held that a general agent or agent having the authority to make and cancel policies may effect a waiver against the insurer under the foregoing rule. Indeed a provision that 'no agent' shall have power to waive any provision in the policy has been held to apply only to local and not to general agents."

We are unwilling to adopt a rule by which disposition of cases such as this is made on the basis of an individual's title. We do not know that all "general agents" in the insurance industry in general or Aetna in particular have and exercise identical authority. Even if they do, the record before us does not define the perimeters of Mr. Gaultney's authority—either that which was specifically delegated to him by his superiors or corporate action of Aetna, or that which he actually exercised in the ordinary course of his employment.

"The test of an agent's authority is not his rank or title but the duties assigned to him and the authority and obligations which go with such assignment." 3 Couch on Insurance 2d § 26:53 at 518.

We have said that we are unwilling to rule on whether Mr. Gaultney had actual authority based upon his title as a matter of law, and when we further say that, based upon the record before us, questions exist as to the nature and extent of that authority, we thereby conclude that a genuine issue of material fact exists requiring reversal of the summary judgment. The issue must be resolved upon trial by the trier of facts.

Even though we have held that reversal is required on the issue of actual authority, since further proceedings will be required below, we deem it appropriate to deal with the closely related question of apparent authority, the elements of which are defined in Douglass v. Mutual Ben. Health & Accident Ass'n., 42 N.M. 190, 76 P.2d 453 (1937). See also Southwestern Portland

Cement v. Beavers, 82 N.M. 218, 478 P.2d 546 (1970), 3 Am.Jur.2d Agency § 75.

From the record before us, we are not prepared to hold that no issue of fact exists as to whether Mr. Gaultney had apparent authority.

■ The issue of authority generally, whether actual or apparent, is usually one of fact. 3 Am.Jur.2d Agency § 360, 3 Couch On Insurance 2d § 26.68.

Aetna argues that Mr. Pribble was charged with a duty to read the policy and thereby became chargeable with notice of its content upon his acceptance and retention of it. In support of this assertion Aetna cites Davern v. American Mutual Liability Insurance Co., 241 N.Y. 318, 150 N.E. 129, 43 A.L.R. 522 (1925) and Bible v. John Hancock Mutual Life Insurance Company, 256 N.Y. 458, 176 N.E. 838 (1931). We doubt that those cases truly stand for the simplistic doctrine which Aetna attributes to them. If they do, we are unwilling to adopt a similar rule. Many more modern cases, the reasoning of which impress us, disclose a tendency to give greater protection to policyholders in a variety of contexts. The trend indicates a purpose to return to practical reality if, indeed, departure was taken from it. Typical of the tendencies of which we speak is the opinion in Harr v. Allstate Insurance Company, 54 N.J. 287, 255 A.2d 208 (1969), where the court said:

"It is clear that this court's approach to defenses to claims on insurance contracts has changed very substantially in recent years. Our expressions have come in a variety of issues and contexts, but all have indicated as their keystone the goal of greater protection to the ordinary policyholder untutored in the intricacies of insurance. We have realistically faced up to the fact that insurance policies are complex contracts of adhesion, prepared by the insurer, not subject to negotiation, in the case of the average person, as to terms and provisions and quite unintelligible to the insured even were he to attempt to read and understand their unfamiliar and technical language and awkward and unclear arrangement. Recognition is given to the usual and justifiable reliance by the purchaser on the agent, because of his special knowledge, to obtain the protection he desires and needs, and on the agent's representations, whether that agent be a so-called 'independent' but authorized representative of the insurer, or only an employee. We have stressed, among other things, the aim that average purchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations; that it is the insurer's burden to obtain, through its representatives, all information pertinent to the risk and the desired coverage before the contract is issued; and that it is likewise its obligation to make policy provisions, especially those relating to coverage, exclusions and vital conditions, plain, clear and prominent to the layman. It is only necessary to list the leading cases." (Citations omitted.)

In Harr, as in this case, the insurance agent had told the insured that he was covered for the loss involved, although there the representation was made in conjunction with the issuance of the policy. The Harr court said on the subject of whether Mr. Harr was bound in the manner contended for here by Aetna:

"We have already pointed out that the fire policy would be confusing to the average person as to coverage, especially with respect to water damage, and in the absence of any admission of thorough understanding from the reading, we think the inference should be drawn, for the purposes of a dismissal action at the end of plaintiffs' case, that Mr. Harr, as a layman, did not so appreciate. While we have said that, in general, an insured is chargeable, for reasons of business utility, with knowledge of the contents of a policy in the absence of fraud or inequitable conduct on the part of the insurer, (citations omitted) where such fraud or inequitable conduct does appear,

as here in the light of Harr's testimony with respect to the agent's representations as to coverage, the insured is bound only to make such examination as would be reasonable for the average person under the particular circumstances, and he will only be held to that to which he would be thereby alerted. (Citations omitted.) Indeed, even absent such representations by the agent, where the language of the policy is such that the layman would not understand its full import were he to attempt to plow through it, such provisions will be deemed to give the maximum protection consistent with its language and the reasonable expectation of the insured, as the Appellate Division pointed out below (citations omitted). And we have also held that where the insured was entitled to and did rely upon the representations of an agent as to coverage, the insured can assume that the policy conforms to the representations and he is not barred from an action against the agent for negligence (or presumably against the agent's principal, the insurer) because he failed to read it at all."

■■ We will not simply mechanically charge Mr. Pribble with the duty of reading and understanding the policy and certificate and then bar him from recovery by a literal application of its terms and provisions. Rather, based on the facts before us, we hold that Mr. Pribble, himself or through his authorized representatives was only bound to make such examination of such documents as would be reasonable for him to do under the circumstances; that he will only be held to that which he would be thereby alerted; and if the language is such that a laymen would not understand its full impact were he to attempt to plow through it, the documents will yield the maximum protection consistent with their language and the reasonable expectation of Mr. Pribble.

Thus, there are genuine issues of fact present which preclude application of the defense asserted by Aetna as a matter of law.

Aetna also cites in support of its contention, inter alia, Porter v. Butte Farms Mutual Insurance Company, 68 N.M. 175, 360 P.2d 372 (1961). Although Porter is readily distinguishable on the facts, it did announce:

" * * * an applicant for insurance who accepts a policy, the provisions of which are plain, clear and free from ambiguity, is chargeable with knowledge of its terms and legal effect. It is the duty of the assured to read and know the contents of the policy before he accepts it, and where he fails or neglects to do so, he is estopped from denying knowledge of its terms and conditions, unless he alleges and proves that he was induced not to read the same by some trick or fraud of the other party."

We are not prepared to say, as a matter of law, that the certificate or policy here was "plain" or "clear." Moreover we are not prepared to say that the exception to the rule is restricted to situations where the policy was not read due to trick or fraud. For we think a situation could arise in which as a reasonable consequence of statements innocently but mistakenly made by one in authority, the insured failed to examine the documents.

Finally, Aetna claims that regardless of other considerations, the summary judgment must stand because estoppel or waiver cannot be used to create or extend coverage. 2 Long, The Law of Liability Insurance § 17:16, 18 Couch on Insurance 2d § 71.39.

Fundamentally entwined in any decision regarding waiver and estoppel is the issue of the authority of Mr. Gaultney, an issue yet unresolved. Since further proceedings are required in any event to deal with that problem, we will leave disposition of the parties' contentions concerning waiver and estoppel until another day.

The summary judgment is reversed and the trial court is directed to reinstate the cause on its docket for further proceedings consistent with this opinion.

It is so ordered.

OMAN and MONTOYA, JJ., concur.