514 P.2d 1301

Charles M. SUTTON, Individually and Administrator and Personal Representative of the Estate of Mona Ray Sutton, Deceased, Plaintiff-Appellant,

v.

CHEVRON OIL COMPANY et al., Defendants-Appellees.

No. 1065.

Court of Appeals of New Mexico.

June 6, 1973.

Certiorari Granted July 18, 1973.

Arthur O. Beach, Joseph L. Smith, Smith & Ransom Law Offices, Albuquerque, for plaintiff-appellant.

Donald L. Jones, K. Gill Shaffer, Shaffer & Butt, Albuquerque, for defendants-appellees.

## OPINION

SUTIN, Judge.

Plaintiff appeals from a summary judgment granted Chevron Oil Company (Chevron) arising out of a claim for dam-

ages for wrongful death caused by alleged negligence of defendant Sharp, the lessee and operator of a Chevron oil station.

We reverse.

Chevron did business as Standard Oil Company of Texas (Standard).

On June 15, 1968, Standard, lessor, leased the service station and premises, located at 845 Juan Tabo Blvd., N.E., Albuquerque, New Mexico, to defendant, Leland A. Sharp. This was entitled "Dealer Lease." It did not authorize Sharp to make necessary repairs to vehicles owned by the public, but it did not deny Sharp this right.

On June 15, 1968, Standard, as Seller, entered into a "Sales Agreement" with Sharp as Buyer, in which Standard agreed to sell and deliver gasoline, motor fuel, lubricating oil and petroleum products to Sharp, and Sharp agreed to purchase and sell.

The "Dealer Lease" provided in part that Sharp was " * * * engaged in an independent business, and nothing herein contained shall be construed as granting to [Standard] any right to control [Sharp's] business or operations, or the manner in which the same shall be conducted."

The Sales Agreement, in addition, provided in part that Standard " * * * has no right to exercise any control over any of [Sharp's] employees, all of whom are entirely under the control and direction of [Sharp], who shall be responsible for their actions and omissions. * * *"

Sharp, by deposition, testified that as far as he knew he was an independent contractor operating on his own and not for someone else.

While the Dealer Lease and Sales Agreement were in effect, the plaintiff's Toyota had been entrusted to Sharp for maintenance and repairs. The accident, which resulted in the fatality of plaintiff's wife, occurred when the brakes failed and the right front wheel of the Toyota came off.

The trial court found:

* * * [T]here is no genuine issue as to any material fact and as grounds therefor the Court relies upon the decision of the New Mexico Supreme Court in the case of Shaver v. Bell, et al., 74 N.M. 700 [397 P.2d 723], and the authorities cited in the movant's Memorandum Brief, *there being an absence of fact which would support a conclusion that Chevron Oil Company exercised or had the right of control over the operations of the station by the lessee, Sharp, or his employee, Buss.* [Emphasis added]

The issue on this appeal is: Was there an absence of fact which would support a conclusion that Chevron exercised or had the right of control over the operation of Sharp's Chevron Service Station?

We believe the trial court erred in two respects: (1) There is a genuine issue of fact whether Chevron exercised or had the right to exercise control over the operation of the station by Sharp or his employee, Buss; (2) "control" is not the exclusive method of determining liability of Chevron for the negligence of Sharp and Buss.

(1) *There is a Genuine Issue of Fact Whether Chevron Exercised or had the Right to Exercise Control.*

A. *The Private Agreement Between Chevron and Sharp is not Binding on the Public.*

The first point to determine is whether an innocent member of the public who deals with a nationally known service station operation is bound by the private agreements between Chevron and Sharp. We say "no."

The "Dealer Lease" created a landlord-tenant relationship between Chevron and Sharp. The "Sales Agreement" created a purchase agreement between Chevron and Sharp. These agreements are secret, private documents which establish the legal relationship between these parties. They govern their respective rights and duties and determine the liability of each party to

the other arising out of litigation in which each party seeks relief from the other.

The motoring public is not aware of the existence of these documents, have no notice of the existence of these documents, nor any knowledge of their contents.

■ *First*, it has long been the rule that a third person who deals with an agent is not bound by any secret or private instructions given to an agent by the principal. South Second Livestock Auction, Inc. v. Roberts, 69 N.M. 155, 364 P.2d 859 (1961); Sterling v. B. & E. Constructors, Inc., 74 N.M. 708, 397 P.2d 729 (1961); Douglass v. Mutual Ben. Health & Accident Ass'n, 42 N.M. 190, 76 P.2d 453 (1937); Echols v. N. C. Ribble Company, 85 N.M. 240, 511 P.2d 566 decided March 2, 1973.

■ Sutton believed that Sharp and Buss were agents and servants of Chevron. He was not bound by the provisions of the documents that Sharp was engaged in an independent business, not subject to any control by Chevron.

*Second*, it is a matter of common and general knowledge that Chevron, under various names, owns, possesses and operates service stations throughout the United States, including the State of New Mexico and the City of Albuquerque; that it engages in substantial national advertising; that it issues Chevron credit cards, sells Chevron products, uses Chevron uniforms, insignia, signs; that its station operators perform services on automobiles; that the purpose of owning, possessing and operating service stations is to encourage the patronage of the motoring public for the benefit of other stations supplied by Chevron. It invites the motoring public to use the facilities of its service stations and it knows the public will make use of its premises, its operators, and seek the services of its operators as well as make purchases of its products, without knowledge of the legal relationship between the parties.

■ *Third*, the motoring public has no duty to inquire about the legal relationship between Chevron and Sharp, or to determine whether a master-servant, principal-agent, landlord-tenant or independent business relationship exists, or to request the production of all written documents for inspection, nor any duty to request the presence of Chevron personnel for examination, nor any duty to obtain an oral or written opinion from Chevron that it has no control over Sharp, and is not liable for the negligence of Sharp. The motoring public relies upon the integrity, the reliability, and the economic and financial status of Chevron. The legal relationship is usually discovered after injury has occurred or litigation has begun.

■ *Fourth*, we weigh the balance between the value of the private documents of Chevron, and Chevron's duty to the motoring public. We believe the burden rests on Chevron to make known to the public at each service station that the possessor is engaged in an independent business; that Chevron has no right to exercise any control over any of the possessor's business operations and employees; that all of the business operations of the possessor are under his control and direction, and the possessor, not Chevron, is responsible for its actions and omissions.

■ *Fifth*, the written agreement between Chevron and Sharp does not determine the issue of control. Jackson v. Standard Oil Company of California, 8 Wash.App. 83, 505 P.2d 139 (1972). After stating contract provisions, identical with those in this case, Judge Pearson wrote:

It is manifest, however, from what we have already said, that a written contract provision disclaiming control is not determinative on the question of control. The relationship of the parties, as amplified by the operating manual, the nature of the undertaking itself, and the amount of control actually exercised in performance of the undertaking, are the determinative factors.

We, therefore, rule that the "Dealer Lease" and "Sales Agreement" cannot be used by Chevron as an escape from liability to a third person as a matter of law.

These agreements govern the rights and duties of Chevron and Sharp in their business operations. See, Lommori v. Milner Hotels, 63 N.M. 342, 319 P.2d 949 (1957).

B. *There was an Issue of Fact over Chevron's Right of Control.*

The facts most favorable to plaintiff show the following:

Plaintiff was the owner of a Toyota. He entrusted the Toyota to defendant Sharp for maintenance and repairs. Defendant Buss was an employee of Sharp. In connection with the regular service station, Sharp operated a "Four Wheel Drive Center" in which he specialized in repairing four wheel drive vehicles. But Sharp considered himself to be just a service station. His jeep had painted on its side, "Four Wheel Drive Center, Lee Sharp Chevron, Albuquerque, New Mexico." He had calling cards advertising "Lee Sharp Chevron" and "Four Wheel Drive Equipment." He had one telephone number for both operations and one set of books and accounts.

■ Chevron personnel cautioned Sharp about keeping the place clean, but never questioned Sharp about the "Four Wheel Drive Center" operation. A reasonable inference can be drawn that Chevron knew about this operation. But Chevron never protested, nor did Chevron prohibit Sharp from using the premises for maintenance and repair of four wheel drive vehicles for public patrons, nor did Chevron contend it was a violation of the "Dealer Lease" agreement. Chevron ratified the acts of Sharp. Grandi v. LeSage, 74 N.M. 799, 399 P.2d 285 (1965); Terry v. Humphreys, 27 N.M. 564, 203 P. 539 (1922).

Prior to authorizing Chevron and Sharp to repair his Toyota, Sutton relied on statements made to him that Chevron had more skillful repairmen, was superior, and specialized in servicing and repair work on vehicles of his kind, the Toyota; that Sharp and Buss were agents and employees of Chevron. In addition to signs, uniforms, credit cards and credit privileges, Sutton relied on Chevron advertising in the classified section of the Albuquerque telephone directory. Here, Chevron states:

At the Sign of the Chevron, *we* take better care of your car with famous Chevron Gasolines and Motor Oils. Also Atlas Tires, Batteries, and Accessories sold on the Chevron Easy-Payment Plan.

"WHERE TO GET SERVICE"

Dealers [Emphasis added].

Below are listed a large number of Chevron service station operations among which are included those which perform auto repairs, tune-ups, brakes, American and foreign car repair, and other forms of service. It advertises "A Mechanic on Duty." This advertising can lead the public to believe Chevron exercises control over its service stations.

Chevron owned the premises of Sharp's Chevron station. It exercised some control over the premises. It dealt directly with Sharp on the sales of Chevron products. Sharp had a duty to diligently promote the sale of Chevron products, to give those products prominent and convenient positions, to keep the premises open for Chevron's benefit, to keep the premises, buildings and equipment in good appearance, clean and orderly to avoid an adverse effect on the motoring public's patronage of other stations supplied by Chevron. There were other miscellaneous restraints on Sharp as well as rights reserved to Chevron.

■ There is a genuine issue of fact to support a conclusion that Chevron exercised or had the right of control over the operations of the Chevron service station by Sharp and his employee, Buss. McCauley v. Ray, 80 N.M. 171, 453 P.2d 192 (1968); *Jackson,* supra.

Chevron relies strongly on Shaver v. Bell, 74 N.M. 700, 397 P.2d 723 (1964). This case does not clothe Chevron with a cloak of immunity from liability.

Bell had leased the premises from an estate, sublet the premises to Cosden Petroleum Corporation (Cosden), which in turn

orally sublet the premises to Bell, and Bell in turn placed others in possession of the property to operate the station. Bell was an intermediate party. Cosden had no direct interest in the premises, never sent its personnel to check the premises, nor did it deal directly with the operator of the station on sales of its products. "Cosden placed no restraints on Bell as sublessee and had no control of any sort over his use of the premises."

After citation of authority, Justice Moise said [p. 705, 397 P.2d p. 727]:

> We would call attention to [two Texas cases], which serve to emphasize that even in the same jurisdiction slight changes in facts may result in different conclusions as to the presence of an issue for determination by the jury. A great number of cases dealing with this subject are annotated [citations]. A study of these cases will reveal that although each case may be used to point out the view courts have taken on specific indicia of control, *every case must ultimately be decided on its unique facts*. . . . [Emphasis added]

In a special concurring opinion in Platco Corporation v. Shaw, 78 N.M. 36, 38, 428 P.2d 10, 12 (1967), Justice Moise said:

> However, control is not the exclusive qualification [in determining whether a given individual is an employee or independent contractor].

We agree because apparent authority, estoppel, public use of premises may be other indicia which determine whether an individual is a servant or independent contractor. These rules of law were not discussed in *Shaver*, supra.

The facts in the present case differ in some respects from those in *Shaver*, supra, and Shaver is not controlling.

**(2)** *"Control" is not the Exclusive Method of Determining Chevron's Liability.*

Although "control" is one method of determining whether a station operator is an employee of an oil company or an inde-

pendent contractor, Shaver v. Bell, supra, it is not the exclusive method of determination.

### A. *Apparent Authority*

Chevron may be liable to plaintiff for the apparent authority with which Chevron has clothed Sharp. *Douglass*, supra; Raulie v. Jackson-Horne Grocery, 48 N.M. 556, 154 P.2d 231 (1944); McNutt Oil & Refining Co. v. Mimbres Valley Bank, 174 F.2d 311 (10th Cir. 1949).

This principle of law has been applied to service station operations. Gizzi v. Texaco, Inc., 437 F.2d 308 (3rd Cir. 1971), cert. den. 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 57; Clark v. Texaco, Inc., 382 S.W.2d 953 (Civ.App.Tex.1964); Standard Oil Co. v. Gentry, 241 Ala. 62, 1 So.2d 29 (1941). Possession of the service station by an operator is prima facie evidence that the operator is the agent of the oil company and is not an independent contractor. Cooper v. Graham, 231 S.C. 404, 98 S.E.2d 843 (1957). Apparent authority is a question of fact for the jury.

From the facts set forth above, we believe apparent authority is an issue of fact for the jury.

### B. *Dangerous Activity*

There is evidence that Sharp was engaged in an independent business free from control by Chevron. Nevertheless, one who employs an independent contractor may be liable for his negligence when the work is intrinsically and inherently dangerous. Pendergrass v. Lovelace, 57 N.M. 661, 262 P.2d 231 (1953). In fact, there are many exceptions to the general rule of non-liability for the negligence of an independent contractor. Srader v. Pecos Construction Company, 71 N.M. 320, 378 P.2d 364 (1963).

A landlord-tenant relationship existed between Chevron and Sharp. Nevertheless, there are exceptions to non-liability of the landlord for injuries to third persons when the injury occurs off the premises. The landlord continues liable for or-

dinary negligence to third persons arising from dangerous activities carried on by the tenant. Lommori v. Milner Hotels, supra.

In the instant case, the claimed negligence of Sharp and Buss was their failure to detect, inspect, discover, properly repair or replace a broken spindle on Sutton's Toyota automobile, or to warn Sutton or the decedent, his wife, of that dangerous condition which resulted in the death of decedent.

 An issue of fact exists whether the work performed was a dangerous activity or inherently dangerous. *Jackson*, supra.

We made the preceding analysis to meet Chevron's contentions of non-liability based on lack of control over the operations of the station by Sharp. To avoid confusion over the liability of national oil companies for negligent acts of station operators, we desire to move forward in the spirit of the Supreme Court of this state to establish a new basis for liability regardless of whether the relationship of principal and agent, master and servant exist. The Supreme Court adopted the doctrine of strict liability in Stang v. Hertz Corporation, 83 N.M. 730, 497 P.2d 732 (1972).

### C. *Chevron is Strictly Liable Under the Doctrine of Administration of Risk.*

In *Stang*, supra, the Supreme Court set forth the historical development of strict liability in tort as applied to products liability cases. It extended the doctrine to apply to the lessor of an automobile. It held the Hertz Corporation strictly liable in tort for the death and injuries resulting from an automobile accident which occurred when a tire blew out on the rented vehicle even though the manufacturer of the tire was exonerated by verdict of the jury.

The philosophical basis of the rule rested on the conditions and needs of the times whch made it appropriate to effect changes. It also followed this principle:

The basis of risk distribution was that the loss should be placed on those most able to bear it and they could then distribute the risk loss to users of the product in the form of higher prices.

The demands of public policy applicable to sellers of a defective product is stated in Restatement of Torts (2nd), § 402A, Comment (c). It provides in part:

* * * [P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the product.

The same public policy should apply to oil companies "for their station operators' torts regardless of whether the relationship of master and servant exist." Lackey, Liability of Oil Company for its Lessee's Torts, U of Ill. Law Forum, 1965, p. 915. The author said [pp. 919–20]:

The most persuasive of these (reasons) fall within what has been called the administration of risk. That term includes risk prevention, risk shifting, and risk distribution.

In defining the "risk" terminology, the author transplants public policy from the doctrine of strict liablity to administration of risk. We agree.

The lessor-lessee strict liability doctrine in *Stang*, supra, was applied to Shell Oil Company because it was a "Commercial Lessor." Price v. Shell Oil Company, 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970). The court said:

We hold in this case that the doctrine of strict liability in tort which we have heretofore made applicable to sellers of personal property is also applicable to bailors and lessors of such property.

For further protection of the consumer, the Supreme Court of California extended the doctrine of strict liability in Cronin v. J.B.E. Olson Corporation, 8 Cal.3d 121, 104

Cal.Rptr. 433, 501 P.2d 1153 (1972); Luque v. McLean, 8 Cal.3d 136, 104 Cal. Rptr. 443, 501 P.2d 1163 (1972).

The doctrine of strict liability began with the manufacturer of a product. It was extended to seller, bailor and lessor. The burden of establishing a claim for relief was lessened for the consumer, but the burden of maintaining an adequate defense was increased for the commercial interests.

In *Jackson,* supra, the doctrine of strict liability was extended further against Standard Oil Company in the distribution of its oil products. Standard Oil sold its unadulterated oil to a wholesale distributor under contract. A corporation carried out the wholesale distributorship contract with Standard Oil. An employee of the latter corporation delivered the oil in a gasoline truck to a storage tank owned by a state agency. At the time the oil was poured into the tank, it became adulterated with gasoline in the hose. Subsequently, the residue in the tank was drained for repairs. During repair work the tank exploded causing the death of the repairman. Standard Oil was held strictly liable because it "retained the right to control purity of the product until delivered to the customer (DNR)." *Jackson* erased from the doctrine of strict liability the essential ingredient that the "defect" must exist at the time the product left the hands of Standard Oil. "Control" was substituted for original place of defect. Strict liability became derivative liability.

This rule leads us into the doctrine of strict liability for defects which result from risks in the administration of service stations. It is comparable to strict liability in the distribution of its products through independent agencies. Both are administrative processes, the risks of which are imposed on the oil companies for the protection of the public.

In the instant case, there is evidence to support a genuine issue of fact that (1) a defect of brakes (2) existed at the time the Toyota was under the control of Standard Oil (3) which was not contemplated by de-

cedent (4) rendered the automobile unreasonably dangerous and unsafe to decedent, and (5) that the defect was the proximate cause of decedent's death.

Oil companies which lease or operate service stations fall within the strict liability doctrine as developed. For the protection of the motoring public, they have a duty to supervise station operators, exercise care in the selection of lessees, insure greater safety and promote accident prevention. Liability risk must be shifted from lessee to the oil company because it is more able than the lessee to bear the costs of accidents or distribute the cost of liability insurance and protect the public from judgment-proof lessees. The distribution of oil products is a part of the business of oil companies, and the costs should be borne by them. "Oil companies should not be permitted to sever this part of their business to avoid the responsibility for injuries resulting in the conduct of that business." *Lackey,* supra.

We hold that Chevron is strictly liable for the torts of Sharp and Buss regardless of the legal relationship created by Chevron. This responsibility is placed on Chevron for the protection of the motoring public who consumes the product or uses the services of the station operator.

The summary judgment is reversed.

It is so ordered.

LOPEZ, J., concurs.

HERNANDEZ, J., specially concurring.

HERNANDEZ, Judge (specially concurring).

I concur in the reversal of the judgment of the trial court solely for the reasons stated below.

The issue dispositive of this appeal is whether a genuine issue of fact exists with respect to the relationship between Chevron, the lessor, and Sharp, the lessee as this relationship affected the plaintiff. "Whether or not a genuine issue of fact exists depends on the peculiar facts of

each case." Goodman v. Brock, 83 N.M. 789, 498 P.2d 676 (1972). In ruling on a motion for summary judgment, all reasonable inferences drawn from the matters before the court are to be drawn in favor of the party opposing the motion. Goodman v. Brock, supra. Montoya v. City of Albuquerque, 82 N.M. 90, 476 P.2d 60 (1970).

Plaintiff was the owner of a Toyota automobile which he had had repaired by defendant Sharp at the defendant's service station. Sharp, in addition to operating the service station, also maintained a "four wheel drive center" on the premises and advertised this repair center by a sign on a jeep vehicle kept at the station. Sharp stated that as far as he was concerned the service station and the repair center were "all one business."

Sharp operated the service station pursuant to a lease agreement between himself as lessee and Chevron Oil Company as lessor. The station was advertised as a Chevron station, sold Chevron products and dispensed gasoline and oil provided by the Chevron organization. Both Sharp and his employees wore uniforms containing a Chevron emblem. Calling cards used as advertising materials by Sharp billed the station as "Lee Sharp Chevron." Customers of the Sharp station were permitted to charge purchases of both products and repairs on Chevron credit cards.

By the terms of the agreement running between Chevron and Sharp, Sharp was obligated to purchase his petroleum products from Chevron. He had an obligation to promote the sale of various other Chevron products and to display those products in prominent and convenient places. His hours of operation were regulated by the agreement and Chevron had the right of inspection of the premises to ensure that the Chevron image was not tarnished by improper or inefficient operation. The operation of the repair center was an integral part of the operation of the service station as a whole.

An examination of the telephone book advertising for Chevron stations shows that the Sharp station was included in a listing entitled "Where to get service." Moreover, Chevron owned the premises on which the Sharp station was located; and the Chevron organization operated other stations in the Albuquerque area directly without a lease arrangement. There is no evidence in the record that any advertising or publicity distinctions are drawn between the leased stations and those stations operated by Chevron sufficient to alert the general public to the differences.

On this appeal Chevron has attempted to set up the lease and operating agreements running between itself and Sharp as dispositive of the issue of Chevron's liability to plaintiff. The "Dealer Lease" and the "Sales Agreement" set out in the record do, on their terms, significantly limit Chevron's control and thereby limit its liability to third parties for the negligent acts or omissions of Sharp or Sharp's employees. However, it appears from the record that neither of these agreements were made known to patrons of Chevron's service stations or to the public generally. Secret or private agreements between principal and agent or master and servant cannot, as a general rule, be used to bind third parties who deal with the servants or agents with no knowledge of the agreements. Sterling v. B. & E. Constructors, Inc., 74 N.M. 708, 397 P.2d 729 (1964); South Second Livestock Auction, Inc. v. Roberts, 69 N.M. 155, 364 P.2d 859 (1961). If plaintiff had no knowledge in fact of the agreements between Chevron and Sharp, the agreements cannot be used by Chevron to insulate itself from liability to third parties. Sterling v. B. & E. Constructors, Inc., supra.

I believe that Chevron may be liable under the doctrine of respondeat superior for Sharp's actions. That doctrine "is applicable during the period of time in which the prinicpal has the right to control an agent's or servant's physical actions." McCauley v. Ray, 80 N.M. 171, 453 P.2d 192 (1968). Since the relationship existing between Sharp and Chevron is crucial to a determination of liability I believe that the proper

test is that set out in Shaver v. Bell, 74 N. M. 700, 397 P.2d 723 (1964):

"Whether a station operator is an employee of an oil company or an independent contractor depends on the facts of each case, the principal consideration being the control, or right to control, of the operation of the station."

Inferences drawn from the record give me reason to believe that Chevron by its various advertising schemes, encouraged its lessee/operators to establish automobile repair facilities on the station premises. The telephone book advertising, for example, lists the Chevron stations in the Albuquerque area under a subheading of "Where to Get Service." The advertising schemes of Chevron indicate that Chevron attempts to convey the idea that service stations carrying its emblem are "full-service" establishments able to perform most tasks of automobile maintenance and repair.

Furthermore, there is evidence in the record from which it can be inferred that Chevron personnel knew of, and at least tacitly approved of, Sharp's establishing of the repair center at the station. Under the terms of the "dealer lease" Chevron had the authority to make periodic inspections of the Sharp station premises to ensure that the facilities were kept clean and neat, that the Chevron products were given proper display and that the station's operation conformed to the provisions of the agreements between Chevron and Sharp. There is evidence in the record that Chevron personnel did inspect the station while the repair center was in operation. No protests were lodged with Sharp and no complaints were made. At no time did Chevron contend that the operation of the repair center violates the terms of the "dealer lease."

Chevron argues that the case of Shaver v. Bell, supra, renders them immune from liability here because the New Mexico Supreme Court in that case held that the defendant lessor was not liable in a slip and fall accident which occurred on the premises of a leased station. In Shaver, the service station operator was a sub-lessee of the corporate defendant, Cosden Petroleum Corporation. The only significant aspects of control to be found in that record were the use of the oil company's name and the sale of company products. "Cosden did not, at any time, send its personnel to check the premises, nor did it deal directly with the operator of the station on sales of its products to him." Shaver v. Bell, supra. While I do not believe that plaintiff has shown such control by Chevron over Sharp as to make Sharp an employee as a matter of law, I do believe that there are sufficient indicia of control to be found in this record to warrant the submission of the issue to a jury.

Moreover, the element of control is not the exclusive factor in determining whether Sharp's actions may bind Chevron. Cf. Platco Corporation v. Shaw, 78 N.M. 36, 428 P.2d 10 (1967) (Concurring opinion by Moise, J.) Chevron may be liable on a theory of either apparent authority or agency by estoppel. There is a genuine question of material fact as to whether plaintiff here entered into the transaction under the reasonable belief that Sharp was authorized to bind Chevron in a valid contract or whether Chevron, having permitted Sharp to operate the repair center, should now be estopped from denying the agency. I agree with the reasoning in Gizzi v. Texaco, Inc., 437 F.2d 308 (3d Cir.), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 57 (1971), that

"The concepts of apparent authority, and agency by estoppel are closely related. Both depend on manifestations by the alleged principal to a third person. . . . The manifestations of the principal may be made directly to the third person, or may be made to the community, by signs or advertising."

I further agree with Gizzi that the plaintiff must have relied on the "indicia of authority originated by the principal" and that "such reliance must have been reasonable under the circumstances."

The issues of apparent authority and agency by estoppel as well as the element of reasonable reliance by the plaintiff are essentially questions of fact and must be resolved by the jury. Pribble v. Aetna Life Ins. Co., 84 N.M. 211, 501 P.2d 255 (1972).

I specifically disagree with the discussion of the issues captioned "dangerous activity" and "strict liability." These issues were not raised by the pleadings, nor were they raised at the hearing on summary judgment or by any of the materials submitted by either party. Furthermore, they were not briefed or argued here.